**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 14-1841**

_____

ZOROASTRIAN CENTER AND DARB-E-MEHR OF METROPOLITAN
WASHINGTON, D.C.,

        Plaintiff – Appellant,

     v.

RUSTAM GUIV FOUNDATION OF NEW YORK; MEHRABAN SHAHRVINI,
Trustee; DARYOUSH JAHANIAN, a/k/a Dariush Jahanian,
Trustee,

        Defendants – Appellees,

     and

SOROOSH SOROOSHIAN; BRUCE NADJMI; KHOSRO MEHRFAR,

        Appellees,

     and

ESFANDIAR ANOUSHIRAVANI, Trustee; KEIKHOSRO MOBED, Trustee;
ROSTAM GHAIBI, Trustee; JAMSHID VARZA, Trustee; ROSTAM
SARFEH, Trustee,

        Defendants.

_____

Appeal from the United States District Court for the Eastern
District of Virginia, at Alexandria.  Liam O'Grady, District
Judge.  (1:13-cv-00980-LO-TRJ)

_____

Argued: September 15, 2015          Decided: May 4, 2016

_____

Before WILKINSON, AGEE, and KEENAN, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Keenan joined.

---

**ARGUED**: Robert Lee Vaughn, Jr., O'CONNOR & VAUGHN LLC, Reston, Virginia, for Appellant. Billy Bernard Ruhling, II, TROUTMAN SANDERS LLP, Tysons Corner, Virginia, for Appellees. **ON BRIEF**: Massie P. Cooper, TROUTMAN SANDERS LLP, Richmond, Virginia, for Appellees.

---

AGEE, Circuit Judge:

The Zoroastrian Center and Darb-E-Mehr of Metropolitan Washington, D.C. ("The Center") is a nonprofit entity dedicated to the advancement and practice of Zoroastrianism, an ancient Persian religion. Rustam Guiv Foundation ("Rustam Guiv") is a charitable trust with a similar mission.[1] As part of a joint effort to construct a Zoroastrian worship center, the parties signed a ninety-nine-year lease on a parcel of property owned by Rustam Guiv in the Vienna area of Fairfax County, Virginia. What followed was a tumultuous relationship that culminated in Rustam Guiv terminating the lease. The Center responded with this litigation seeking, among other things, a declaratory judgment to reinstate the lease. Rustam Guiv removed the case to federal court, where the district court ultimately granted summary judgment to Rustam Guiv and awarded attorneys' fees. On appeal, The Center raises several claims of error, including the threshold question of whether federal subject matter jurisdiction existed.

We agree with the district court that The Center's case cannot go forward. Rustam Guiv presented sufficient evidence to show complete diversity between the parties, thereby establishing subject matter jurisdiction in federal court.

---

[1] Except as indicated, we reference the Rustam Guiv trust and its individual trustees as "Rustam Guiv" collectively.

3

Likewise, the undisputed material facts show that The Center breached the lease, so we affirm the district court's decision to dismiss the complaint in its entirety and enter judgment for Rustam Guiv.

The district court's attorneys' fee award, however, presents another matter. Under Virginia law governing contractual fee-shifting provisions, the prevailing party is entitled to recover attorneys' fees for work performed only on its successful claims. See Ulloa v. QSP, Inc., 271 Va. 72, 82 (2006). The district court correctly identified Rustam Guiv as the prevailing party but made no effort to narrow the fee award to its successful claims. Thus, we vacate the district court's fee award and remand for further proceedings as to that issue.

I.

A.

Rustam Guiv owns a seven-acre parcel of property in Vienna, Virginia. In 1991, Rustam Guiv leased this land to The Center for ninety-nine years at a nominal rent of one dollar a year. In return, The Center was to construct "a place of worship for all Zoroastrians of the world"; "a facility for the advancement of the Zoroastrian religion"; and "a dwelling suitable for

4

residence of a Mobed (priest)." J.A. 41.[2] The Center would bear all costs of improving the property to meet these requirements.[3] The lease did not include a firm deadline for this construction, but did provide that "time is of the essence." J.A. 50.

The Center contends it invested "thousands of dollars" in planning and designing a worship facility, which included obtaining permits and density exemptions from the Fairfax County government. Despite these alleged efforts, however, The Center did not begin actual construction for many years. And, by 2008, The Center still had not completed a single structure.

Frustrated with the state of progress, Rustam Guiv threatened to rescind the lease. The parties then executed a lease amendment dated January 1, 2009, designed to "re-energize [The Center's] efforts." J.A. 261. Together, the original lease and amendment governed the parties' lessor-lessee relationship.

Several clauses from the lease amendment are pertinent here. First, The Center agreed to "undertake such construction [of a religious center] no later than November 1, 2009" and complete the project by March 13, 2011. J.A. 55. Although

---

[2] This opinion omits internal marks, alterations, citations, emphasis, or footnotes from quotations unless otherwise noted.

[3] The Center was also required to pay all real estate taxes and related assessments, the cost of insurance, and all utilities.

Rustam Guiv was allowed to extend this completion deadline, in no event could construction go past March 15, 2013. The amendment further permitted Rustam Guiv to terminate the lease if "substantial" activity had not been undertaken by either date. J.A. 55-56. As these provisions make clear, the lease amendment was designed to speed the pace of construction by instituting hard deadlines.

For financial reasons not entirely clear from the record, The Center missed the start deadline for construction. This set in motion a series of meetings that culminated with Rustam Guiv notifying The Center that it was pursuing a partnership with another charitable foundation for a Zoroastrian temple in Maryland. Dr. Daryoush Jahanian, who can best be described as RGF's lead trustee, followed up with an email explaining that this alternate site would be sufficient to service the regional Washington Zoroastrian community, and consequently, The Center should "stop signing any contract[s] and . . . not write any check[s] as much as possible." J.A. 869. The Center "temporarily stopped the progress" on this recommendation from Dr. Jahanian, but soon decided "to stay on course" and continue its efforts at construction. J.A. 473.

In sum, by the end of April 2010, the original lease had been amended to include particular construction deadlines, the first of which had been missed. Rustam Guiv had chosen to focus

6

its efforts on an alternative site and requested The Center to stop construction. The Center briefly ceased its operations, but within a few weeks, elected to continue with its plans.

B.

The parties remained at a virtual standstill for over a year without significant dialogue. The Center alleges that it could not "obtain bonds that were required by Fairfax County" or "pull any permits" without Rustam Guiv's consent, and thus its construction activities stalled. Opening Br. 11. Rustam Guiv, in turn, was pursuing the Maryland site.

In March 2011, Rustam Guiv contacted The Center for an in-person meeting about taking possession of the Vienna property. During the subsequent conference, however, the parties agreed to continue construction on the Vienna building as reflected in a one-page, hand-written Memorandum of Understanding ("MOU") that included the following provisions:

> 1 – [Rustam Guiv] will be in full cooperation with [The Center] in facilitating the required paperwork.
>
> 2 – [The Center] will provide to [Rustam Guiv] an accounting book to list the names [and] amounts of all donations and all expenses. [The Center] will also continue to provide quarterly financial report[s] [and] account summar[ies] of all donations and expenses.
>
> 3 – [The Center] will provide an accomplishment plan with milestones [and]

7

> deadlines, mutually agreed by the two
> parties.
>
> . . . .
>
> 6 – Items 2, 3 and 5 above will be provided
> on or before 5/15/2011 and must be approved
> by [Rustam Guiv].

J.A. 495-96.

As required by the MOU, The Center delivered an initial report on May 15, 2011. That report, however, failed to include a full accounting, list of donor activity, or accomplishment milestones. For reasons unknown, Rustam Guiv did not object to these deficiencies, and the parties again went silent.

On April 20, 2013 -- approximately two years after the MOU was drafted, four years after the lease amendment, and over twenty years after the original lease was signed -- Rustam Guiv sent The Center a formal notice terminating the lease. As grounds, Rustam Guiv cited The Center's failure to complete construction of a worship center by March 15, 2013, the final deadline in the lease amendment. The Center responded with this litigation seeking, among other relief, a declaratory judgment that the lease remained in effect.

## C.

The Center filed its initial complaint in the Fairfax County Circuit Court, naming Rustam Guiv and its trustees, individually, as defendants. Rustam Guiv timely removed the

8

case to the Eastern District of Virginia based on diversity of citizenship. Opposed to proceeding in federal court, The Center sought remand on grounds that Rustam Guiv had failed to show the complete diversity necessary to establish federal jurisdiction.

In its order, the district court noted that neither the Supreme Court nor the Fourth Circuit had addressed the precise issue of how to determine the citizenship of a defendant-trust for purposes of diversity jurisdiction. Faced with a lack of binding precedent, the court adopted the Third Circuit's test: the citizenship of a trust is determined by looking at the citizenship of both the trustees and beneficiaries. See Emerald Inv'rs Tr. v. Gaunt Parsippany Partners, 492 F.3d 192, 205 (3d Cir. 2007). Having settled on this framework, the district court reserved judgment "until the parties [had] presented [further] evidence of [Rustam Guiv's] citizenship . . . and additional evidence related to the trust's beneficiaries." J.A. 166.

Rustam Guiv then submitted an affidavit from Dr. Jahanian and residence information for the current trustees. These documents affirmed that none of its current trustees or beneficiaries were Virginia residents. Based on this evidence, and over The Center's objection, the district court denied The Center's motion to remand.

The Center filed an amended complaint requesting a declaratory judgment that the original lease remains in full force and effect (Count I); an order restraining Rustam Guiv from interfering with its rights under the lease (Counts II and III); and a judgment that Rustam Guiv had breached the lease and was liable for damages (Count IV). Meanwhile, Rustam Guiv filed its answer along with several counterclaims seeking relief for breach of contract (Counterclaim Count I); slander of title (Counterclaim Count II); and quiet title (Counterclaim Count III).

The parties filed cross-motions for summary judgment at the close of discovery. Although The Center presented a litany of arguments to the district court, its principle theory of the case rested on the MOU and its enforceability. According to The Center, Rustam Guiv had no authority to cancel the lease because the MOU was a binding agreement that rescinded the construction timeline in the lease and lease amendment.

Following oral argument, the district court granted summary judgment to Rustam Guiv. The court found that The Center had breached the lease by failing to construct a temple before the final deadline, and as a result, Rustam Guiv validly exercised its right to end the lease. The court rejected The Center's argument that the MOU altered the lease amendment's deadlines,

10

concluding it was "too vague to be enforceable." J.A. 1170. The court further noted, "[e]ven if [the MOU] read as a modification of the lease arrangement . . . nothing in [it] eliminates or alters the dispositive deadlines." Id. Therefore, "RGF still had the right to terminate the tenancy." Id. The effect of this order was to dismiss The Center's amended complaint with prejudice and enter judgment in favor of Rustam Guiv.[4]

Rustam Guiv then petitioned the court for an award of attorneys' fees. After adjusting the billing rates and time billed by several attorneys, the district court granted Rustam Guiv's fee request. The Center filed a motion for reconsideration, which the district court denied.

The Center timely appealed, challenging both the district court's decision on the merits and the fee award. We have jurisdiction under 28 U.S.C. § 1291.

After oral argument in this case, the Supreme Court granted certiorari in Americold Realty Trust v. ConAgra Foods, Inc. "to resolve confusion among the Courts of Appeals regarding the citizenship of unincorporated entities." 136 S. Ct. 1012, 1015

_____

[4] Although summary judgment was awarded to Rustam Guiv, not all of Rustam Guiv's claims were successful. Specifically, the district court rejected the slander of title counterclaim. That finding is relevant in the context of its attorneys' fee award as discussed below.

11

(2016). Consequently, we held this case in abeyance pending the Supreme Court's decision, which has issued and is reviewed below.

## II.

We first address Rustam Guiv's argument concerning the standard of review. Typically we consider a district court's decision on summary judgment de novo, applying the same legal standards as the district court and viewing the facts in the light most favorable to the nonmoving party. FDIC v. Cashion, 720 F.3d 169, 173 (4th Cir. 2013). Rustam Guiv argues instead that the standard of review should be abuse of discretion because The Center noticed its appeal from the order denying its motion for reconsideration. See Robinson v. Wix Filtration Corp., 599 F.3d 403, 407 (4th Cir. 2010) ("This court reviews the denial of a Rule 59(e) motion under the deferential abuse of discretion standard.").

Although the factual underpinning of Rustam Guiv's argument is correct -- The Center's notice of appeal designates the district court's ruling on the motion for reconsideration -- its legal conclusion does not follow. "[W]e should be liberal in passing on the sufficiency of a notice of appeal," and the "designation of a postjudgment motion in the notice of appeal is adequate to support a review of the final judgment when the

12

intent to do so is clear" and there is no prejudice. MLC Auto., LLC v. Town of S. Pines, 532 F.3d 269, 279 (4th Cir. 2008) (citations omitted). That is the case here.

The Center's notice of appeal references the final order from its motion for reconsideration but simultaneously requests review of the "relief" granted Rustam Guiv by the district court. J.A. 1295. On these facts, we believe The Center's intent to appeal the district court's summary judgment ruling is sufficiently clear. And since the parties have both extensively briefed the underlying judgment, Rustam Guiv does not face any measurable prejudice. See Nat'l Ecological Found. v. Alexander, 496 F.3d 466, 477 (6th Cir. 2007) (affirming that an appeal of a motion for reconsideration preserves general appellate review so long as parties "fully argued the merits of the prior orders"). Accordingly, we will apply the typical de novo standard of review where required.

We also note that Virginia supplies the substantive law here since the district court was sitting in diversity. See Gen. Tech. Applications, Inc. v. Exro Ltda, 388 F.3d 114, 118 (4th Cir. 2004) ("In a diversity case, we must consult state law to determine the nature of the litigant's rights . . . .").

13

III.

The Center contends that the district court was required to remand this case to the Virginia state court because Rustam Guiv failed to prove the diversity of citizenship necessary to establish federal subject matter jurisdiction. In its view, deficiencies in Rustam Guiv's proffered evidence made it "impossible for the District Court to decide whether [complete] diversity existed." Opening Br. 29. As a result, removal "was in error." Id. at 37.

The Center is correct that Rustam Guiv bears the burden of proof, by a preponderance of the evidence, to show the parties' citizenship to be diverse. See Mulcahey v. Columbia Organic Chems. Co., 29 F.3d 148, 151 (4th Cir. 1994) ("The burden of establishing federal jurisdiction is placed upon the party seeking removal."). However, the case presents a threshold question that both sides largely ignored in their briefs –- how is the citizenship of a trust such as Rustam Guiv to be determined for purposes of diversity jurisdiction? The resolution of this initial inquiry determines the evidentiary factors a court should consider in the jurisdictional analysis.

A.

Despite over two centuries of federal litigation involving trusts, the method for determining a trust's citizenship was long unsettled and the subject of much debate. See Americold,

14

136 S. Ct. at 1016 ("[C]onfusion regarding the citizenship of a trust is understandable and widely shared."). Two Supreme Court cases in particular gave rise to a divergence in lower-court decisions on this issue: Navarro Savings Ass'n v. Lee, 446 U.S. 458 (1980), and Carden v. Arkoma Associates, 494 U.S. 185 (1990).

In Navarro, the individual trustees of a business trust, suing in their own names, brought an action for breach of contract. 446 U.S. at 459-60. The defendants disputed jurisdiction, arguing that the trust's beneficiaries, and not the trustees, were the real parties to the controversy and their citizenship should control. The question presented was whether "trustees of a business trust may invoke the diversity jurisdiction of the federal courts on the basis of their own citizenship, rather than that of the trust's beneficial shareholders." Id. at 458. After looking at the role of the trustees and beneficiaries with respect to the trust, the Court found that "a trustee is a real party to the controversy for purposes of diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others." Id. at 464. The Court concluded, "trustees who meet this standard [may] sue in their own right, without regard to the citizenship of the trust beneficiaries." Id. at 465–66.

Although Navarro involved an action brought in the name of individual trustees, it was generally read to imply that when a trustee "possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others," id. at 464, a court should refer only to the citizenship of the trustee to determine the trust's citizenship, see Ind. Gas Co. v. Home Ins. Co., 141 F.3d 314, 318 (7th Cir. 1998).

A decade later, in Carden, the Supreme Court offered additional directions on this issue. In that case, a limited partnership brought a contract claim in district court on the basis of diversity jurisdiction. Carden, 494 U.S. at 186. The partnership contended that, like corporations, its citizenship should be determined with reference to the state in which it was organized or, alternatively, with reference to the citizenship of its general partners only. Id. at 187–96. The Court disagreed, holding that "diversity jurisdiction in a suit by or against [an artificial] entity depends on the citizenship of all the members." Id. at 195. In articulating this "all the members" rule, the Court explicitly distinguished Navarro: "Navarro had nothing to do with the citizenship of the 'trust,' since it was a suit by the trustees in their own names." Id. at 192–93. The Court further emphasized that Navarro concerned the distinct question of whether the trustees in that action "were the real parties to the controversy." Id. at 191.

16

Lower courts interpreted these cases in very different ways. Some courts, relying on Navarro, concluded that a trust has the citizenship of its trustees. See, e.g., Mullins v. TestAmerica, Inc., 564 F.3d 386, 397 n.6 (5th Cir. 2009). Following Carden, other courts held the view that the citizenship of a trust depends on the citizenship of its trustees and beneficiaries, as they are analogous to being the "members" of the trust. See Emerald Inv'rs Tr., 492 F.3d at 201 ("[D]iversity jurisdiction by or against an artificial entity depends on the citizenship of 'all the members.'").[5] In the case at bar, the district court followed the latter approach and looked at the citizenship of both the trustees and beneficiaries of Rustam Guiv to determine diversity. The Supreme Court granted certiorari in Americold Realty Trust v. ConAgra Foods, Inc., 136 S. Ct. 1012 (2016), ostensibly to resolve this circuit split.

Americold involved a real estate investment trust which, under the applicable state law, was deemed owned and controlled by its "members," the equivalents of a corporation's shareholders. However, "as Americold [wa]s not a corporation,

---

[5] Corporations are treated differently by statute as distinct legal persons. See 28 U.S.C. § 1332(c) (recognizing that corporations are a distinct entity which "shall be deemed to be a citizen of every State and foreign state by which it has been incorporated and of the State or foreign state where it has its principal place of business").

17

it possesse[d] its members' citizenship." Id. at 1015 (noting that under 28 U.S.C. § 1332(c) only corporations "should also be considered a citizen of the State where it has its principal place of business"). For such unincorporated entities, the Supreme Court adhered to the "oft-repeated rule that diversity jurisdiction in a suit by or against the entity depends on the citizenship of all its members." Id.

The Supreme Court rejected Americold's argument that Navarro called for the opposite conclusion. The Court again "reminded litigants" that "Navarro had nothing to do with the citizenship of a trust." Americold, 136 S. Ct. at 1016. "Rather, Navarro reaffirmed a separate rule that when a trustee files a lawsuit in her name, her jurisdictional citizenship is the state to which she belongs -- as is true of any natural person." Id. Perhaps in dicta, the Supreme Court went on to note that when a trustee of "a traditional trust" files a lawsuit or is sued in her own name, "there is no need to determine its membership, as would be true if the trust, as an entity, were sued." Id. (emphasis added).

Having settled the diversity of citizenship question for real estate investment trusts, perhaps the Supreme Court in Americold intended this statement to globally resolve the issue for other trusts. However, the statement may generate as many questions as it answers. Putting aside the lack of a

18

comprehensive definition of a "traditional trust," the "as would be true if the trust, as an entity were sued" phrase seems open to several interpretations.

For example, does the phrase mean that there is no need to determine entity membership for diversity purposes when a "traditional trust" is sued as an entity? Or do we read the statement to mean that a trust sued as an entity must prove entity membership because it is a separate legal person from the individual trustees? We need not resolve those questions now, however, as the record here reflects diversity exists whether the trustees, the trust beneficiaries, or both are the subject of the citizenship requirement.

It is clear from the record evidence that the trustees are residents of other states and not Virginia. Although The Center contends Rustam Guiv's evidence on this point is insufficient, the district court found it credible, and The Center has offered no contradictory evidence. The Center's arguments go to two areas -- witness credibility and the weight of the evidence -- where we defer to the findings of the trier of fact when substantial evidence in the record supports those findings. See Sligh v. Doe, 596 F.2d 1169, 1171 n.9 (4th Cir. 1979) ("It is plain that the 'clearly erroneous' rule applies to jurisdictional . . . determinations."); U.S. ex rel. Vuyyuru v. Jadhav, 555 F.3d 337, 348 (4th Cir. 2009) ("We review a district

19

court's jurisdictional findings of fact . . . under the clearly erroneous standard of review and any legal conclusions flowing therefrom de novo."). This record contains substantial evidence, and we find nothing erroneous, much less clearly erroneous, in the district court's conclusion that Rustam Guiv proved by a preponderance of the evidence the trustees' diversity of citizenship from The Center.[6]

Moreover, the record does not establish any beneficiaries of the Rustam Guiv trust in Virginia. Rustam Guiv proffered it had no beneficiaries in Virginia. In response, The Center contended there were two Virginia beneficiaries: itself and Fairfax County.

The Center, however, is not a trust beneficiary; it is simply a tenant in a landlord/tenant business relationship with

---

[6] The Center posits that Rustam Guiv's affidavits are insufficient because they contain evidence of the trustee's residence, which is not the same as citizenship. It is true that residency and citizenship are not interchangeable in the jurisdictional context. See Axel Johnson, Inc. v. Carroll Carolina Oil Co., 145 F.3d 660, 663 (4th Cir. 1998) ("As the Supreme Court has consistently held, however, state citizenship for purposes of diversity jurisdiction depends not on residence, but on national citizenship and domicile."). But The Center is mistaken that the evidence here is inadequate to establish citizenship. Physical presence coupled with residency is prima facie proof of citizenship, see Krasnov v. Dinan, 465 F.2d 1298, 1300 (3d Cir. 1972), and Rustam Guiv has shown more than that here through its affidavits and other evidence. Without something to cast doubt on this evidence, the district court did not err by accepting these facts as adequate to establish the trustees' citizenship.

Rustam Guiv. And The Center did not contend otherwise below, where its argument was that the lease was cancelled by the MOU. Neither is Fairfax County a trust beneficiary. The Center posits that by granting storm water and public street easements to the County, as required by local code for the development of the property, Rustam Guiv somehow created a beneficiary relationship status despite The Center's concession that "[i]n exchange, [Rustam Guiv] received a density credit." Opening Br. 38. The Center cites no precedent or statute for its argument and with good reason. Compliance with required subdivision ordinances or building codes by a trust owning real property confers no beneficiary status on the government entity any more so than would payment of real estate taxes. This is particularly true here where Rustam Guiv received an asset, a density credit, in exchange for the easements. Accordingly, we find no error in the district court's determination that Rustam Guiv had no trust beneficiaries in Virginia.

Whether <u>Americold</u> has resolved "confusion among the Courts of Appeals regarding the citizenship of unincorporated entities" we leave to others to answer. 136 S. Ct. at 1015. In this case, regardless of the test applied, Rustam Guiv met its burden to prove diversity of citizenship. Thus, the district court did not err in concluding it had subject matter jurisdiction.

21

IV.

We now turn to the merits. The district court concluded that the lease amendment was binding and that The Center breached the lease by failing to construct a temple on the Vienna property before the final deadline. Consequently, the court granted summary judgment in favor of Rustam Guiv. The Center raises a host of challenges to this judgment, none of which are meritorious.

A.

Initially, The Center argues that inconsistent and conflicting testimony from Rustam Guiv's witnesses created "issue[s] of fact which can only be determined at trial." Opening Br. 44. In the Center's view, "when there is a conflict in the testimony and an issue as to the veracity of the witnesses, summary judgment is not proper." Id. at 41.

While conflicting testimony can indeed preclude summary judgment, any inconsistency must concern a material fact. As the Supreme Court has explained, the mere existence of a factual dispute "will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986).

In its effort to establish a contested issue of material fact, The Center first points to conflicting testimony regarding

22

who drafted the lease amendment. According to The Center, this inconsistency concerns a "key point" that a factfinder should have resolved. Opening Br. 21. However, on the record in this case, who drafted the lease amendment is irrelevant. This document is unambiguous and its contents uncontested. Any inconsistency about its authorship thus has no bearing here. See Martin & Martin, Inc. v. Bradley Enters., Inc., 256 Va. 288, 291 (1998) ("In the event of an ambiguity in the written contract, such ambiguity must be construed against the drafter of the agreement."); Lexicon, Inc. v. Safeco Ins. Co. of Am., 436 F.3d 662, 671 (6th Cir. 2006) (explaining that "it may be relevant which party drafted" an agreement when it is ambiguous).

The Center next suggests that, because Dr. Jahanian referred to the MOU as a binding agreement, the district court should have submitted this issue to the jury instead of unilaterally deciding it was "too vague to be enforceable." J.A. 1170. This argument suffers from the same deficiency noted above: Whether a written contract is sufficiently definite is a question of law that we determine from looking at the document. See Williams v. Dynatech Commc'ns, Inc., 163 F.3d 600, 604 (4th Cir. 1998). Hence, Dr. Jahanian's statements about the MOU, even if inconsistent, are not relevant.

23

Finally, to the extent The Center suggests that Dr. Jahanian's credibility created a material issue of fact to preclude summary judgment, that argument also fails. Where the determination of what actually happened depends on an assessment of the credibility of the respective witnesses, "[t]his assessment is a disputed issue of fact [that] cannot be resolved on summary judgment." Rainey v. Conerly, 973 F.2d 321, 324 (4th Cir. 1992). But this case does not turn on the credibility of Dr. Jahanian or any other witness. Quite the opposite, this controversy arises from the unambiguous written terms of a landlord-tenant arrangement. Thus, the dispute is governed by the legal import of the terms of that agreement, not the credibility of ancillary witnesses.

Although this case involves a complicated and lengthy lessor-lessee relationship, it is fundamentally a contract dispute governed by the parties' agreements. As such, conflicting testimony and credibility issues, like those The Center raises, are not material here and are not a ground upon which the district court judgment can be disturbed.

B.

The Center also argues that the district court erred by enforcing the terms of the lease amendment to the exclusion of the MOU. As this argument goes, "the MOU was intended to, and did in fact, supersede the Lease Amendment," and so "[t]he

24

District Court's finding that [The Center] breached the subject Lease, as [a]mended, by failing to timely construct the [temple] on the lease property was in error." Opening Br. 21-22. The district court rejected this argument, finding the MOU was unenforceable as a matter of law. We agree.

The basic requirements for a valid contract are well settled. "[A]n agreement must be definite and certain as to its terms and requirements; it must identify the subject matter and spell out the essential commitments and agreements with respect thereto." Progressive Const. Co. v. Thumm, 209 Va. 24, 30-31 (1968). In practical terms, a contract "must be sufficiently definite to enable a court to give it an exact meaning, and must obligate the contracting parties to matters definitely ascertained or ascertainable." Smith v. Farrell, 199 Va. 121, 128 (1957).

The MOU is not sufficiently definite to be enforceable. It does not refer either explicitly or implicitly to the lease, the Vienna property, or the nature of the parties' relationship. As the district court found, were it not for the extensive history between the parties, this document would be unenforceable on its face. See W.J. Schafer Assocs. v. Cordant, Inc., 254 Va. 514, 519 (1997); Stanley's Cafeteria, Inc. v. Abramson, 226 Va. 68, 73 (1983). But even considering how the document arose, it is not possible to decipher what mutual obligations exist. The

25

most definite clauses outline broad tasks for The Center to complete by deadlines to be mutually agreed upon in the future. Such "agreements to agree" are uniformly unenforceable in Virginia. Allen v. Aetna Cas. & Sur. Co., 222 Va. 361, 363 (1981); see also EG&G, Inc. v. Cube Corp., No. 178996, 2002 WL 31950215, at *6-7 (Va. Cir. Ct. Dec. 23, 2002) ("[W]here the evidence is that the parties merely agreed to make an agreement in the future, and where a determination of the terms and conditions under which the obligation would be assumed are vague and uncertain, Virginia law treats such agreements as unenforceable 'agreements to agree.'" ).

Even assuming the MOU was binding and enforceable, The Center still cannot prevail. Nothing in the MOU eliminates or alters the dispositive deadlines that The Center breached in the lease amendment. At most, it states the parties would later agree on different deadlines, which never occurred. Therefore, the MOU had no effect on the lease and lease amendment or The Center's breach of those obligations.

C.

The Center next argues that the doctrine of equitable estoppel precluded Rustam Guiv from enforcing the lease amendment's deadlines because Dr. Jahanian directed The Center to stop construction. The Center maintains that it "did, in fact, cease its efforts" and so "[t]o allow RGF to now seek to

26

use the deadline of the [l]ease [a]mendment as a basis to declare the [l]ease terminated would be a gross miscarriage of justice." Opening Br. 48-49.

We agree with the district court that the doctrine of equitable estoppel has no application here. To prevail on this claim, The Center was required to show "(1) a representation, (2) reliance, (3) change of position, and (4) detriment." Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust, 243 Va. 53, 59 (1992). This doctrine is "applied rarely and only from necessity," and the moving party must prove "each element by clear, precise, and unequivocal evidence." Id.

Even viewing the record in The Center's favor, it fails in its burden of proof on the final two elements. Nothing suggests The Center materially changed its position in light of Dr. Jahanian's statements or Rustam Guiv shifting its focus to the Maryland site. In fact, The Center sent a formal letter outlining its decision to ignore Rustam Guiv and "stay on course." J.A. 473. The same letter further notes that The Center only "temporarily stopped the progress of [its] work." Id. As the district court rightly concluded, this admittedly "brief pause, resulting in no material change in [The Center's] position, cannot be said to represent detrimental reliance." Id. at 1173.

The Center now counters that it could not resume construction immediately but had to wait until April 2011 to renew efforts with the help of Rustam Guiv. We are unpersuaded this alters the outcome. Even accepting this new timeframe, The Center still had at least <u>two</u> <u>years</u> to build the temple, which is well within the lease amendment's schedule. Yet, at the time of this litigation, the site remained largely untouched. We thus conclude, to the extent The Center was unable to proceed, this brief period would not have prevented The Center from complying with the lease amendment's obligations.

At bottom, the record suggests that The Center simply failed to meet its obligations and sat on its hands in the face of looming contractual deadlines. Having failed to fulfill its side of the bargain due to this inactivity, The Center cannot look to equity to avoid the effects of its own breach.

D.

In its last volley, The Center argues for the first time that it did not breach the lease amendment because there was a temple on the property by the final deadline.[7] According to The

---

[7] During oral argument, counsel represented to the Court that this point was raised below and thus we can consider it de novo on appeal. The record does not support counsel's claim. Although The Center did mention that it renovated an existing building on the property that was then used for prayer services, J.A. 1136, nowhere was it further argued that this action was sufficient to satisfy the lease obligations. On the contrary, (Continued)

28

Center, it "renovated a building on the Vienna [p]roperty which was actively being used as a Zoroastrian worship center and meeting place."  Opening Br. 50.

Issues raised for the first time on appeal are generally not considered by this Court.  See Singleton v. Wulff, 428 U.S. 106, 120 (1976); United States v. One 1971 Mercedes Benz 2-Door Coupe, 542 F.2d 912, 915 (4th Cir. 1976) (explaining that the failure to raise and preserve an issue in district court ordinarily waives consideration of that issue on appeal).  Although we have occasionally departed from this general rule, The Center has failed to raise any argument that such exceptional circumstances are present here.  See In re Under Seal, 749 F.3d 276, 285 (4th Cir. 2014) ("When a party in a civil case fails to raise an argument in the lower court and instead raises it for the first time before us, we may reverse only if the newly raised argument establishes fundamental error or a denial of fundamental justice.").  On this record, we find the claim waived.

---

The Center repeatedly conceded that it never fulfilled the lease amendment's final construction deadline.  Id. at 941, 1102.  The Center instead opted to continue with its theory that compliance was irrelevant because this document was null and void.  See id. at 1150-56.

Having found none of The Center's challenges to the district court's judgment to be meritorious, we turn to the award of attorneys' fees. The Center's principal argument here is that the court erred by allowing Rustam Guiv "to recover fees for all services performed in the litigation, not just those [claims] on which it did, in fact, prevail." Opening Br. 51.

We generally review a district court's decision awarding or denying attorneys' fees for abuse of discretion. McAfee v. Boczar, 738 F.3d 81, 88 (4th Cir. 2013). Under this standard, reversal is appropriate only if "the district court [was] clearly wrong or has committed an error of law." Id. That said, legal determinations justifying an award, such as whether the plaintiff is a prevailing party, are reviewed de novo. Smyth v. Rivero, 282 F.3d 268, 274 (4th Cir. 2002). The parties agree that Virginia supplies the substantive law here since the district court was sitting in diversity.

The lease specifies that "[i]n the event of any litigation between the parties hereto, the prevailing party in such litigation shall be entitled to recover from the other party its costs, expenses and reasonable attorney's fees." J.A. 47-48. The Center appears to concede that Rustam Guiv is the prevailing party under this provision. We agree. As the Virginia Supreme Court has explained, the "prevailing party" is "the party in

30

whose favor the decision or verdict in the case is . . . rendered." <u>Sheets v. Castle</u>, 263 Va. 407, 414 (2002). The reviewing court is to consider "the general result" of the case and determine "who has, in the view of the law, succeeded in the action." <u>Id.</u> The Center brought this action to enforce a contract between the parties, and Rustam Guiv defended on grounds that the agreement was terminated by The Center's breach. The district court ultimately entered judgment in favor of Rustam Guiv, clearly making it the prevailing party. <u>See</u> <u>Chase v. DaimlerChrysler Corp.</u>, 266 Va. 544, 548-49 (2003) (equating "prevailing party" with "successful party").

Prevailing party status does not, however, automatically make that party eligible for all the fees they request. In Virginia, "each party [has] the burden of establishing, as an element of its <u>prima</u> <u>facie</u> case, that the attorneys' fees it seeks are reasonable in relation to the results obtained and were necessary." <u>Chawla v. BurgerBusters, Inc.</u>, 255 Va. 616, 624 (1998). Moreover, "[n]either party shall be entitled to recover fees for duplicative work or for work that was performed on unsuccessful claims." <u>Id.</u> It is well-settled in Virginia that "under contractual [fee-shifting] provisions a party is not

31

entitled to recover fees for work performed on unsuccessful claims." Ulloa, 271 Va. at 82.[8]

Although Rustam Guiv prevailed below, it was not wholly successful. In particular, the district court rejected one of its counterclaims and ruled in favor of The Center. Consequently, Rustam Guiv was barred from recovering "fees for . . . work that was performed on [this] unsuccessful claim." Chawla, 255 Va. at 624. The district court, however, never narrowed the fee award to account for the ruling against Rustam Guiv. Absent some discount or reduction for this unsuccessful counterclaim, the court's fee award includes time spent on matters for which Rustam Guiv was not entitled to recover under Virginia law. See Ulloa, 271 Va. at 82. Accordingly, we vacate and remand the district court's attorneys' fee award for further proceedings in accordance with this opinion.

VI.

The record shows that The Center breached the parties' lease by failing to complete construction of the required religious center by the lease deadline. We therefore agree with

---

[8] Federal courts take a different approach on federal claims by allowing a prevailing party to recover fees for unsuccessful claims where the entire case "involve[s] a common core of facts or . . . related legal theories." Hensley v. Eckerhart, 461 U.S. 424, 435 (1983). The Virginia Supreme Court, however, has steadfastly rejected this approach. See Ulloa, 271 Va. at 83.

32

the district court that Rustam Guiv was entitled to summary judgment. Consequently, we affirm the district court's judgment on the merits. However, for the reasons outlined above, we vacate the district court's attorneys' fee award and remand for further proceedings consistent with this opinion.

<u>AFFIRMED IN PART,</u>
<u>VACATED IN PART,</u>
<u>AND REMANDED</u>