**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-1104**

---

COLORADO BANKERS LIFE INSURANCE COMPANY,

Plaintiff - Appellee,

v.

ACADEMY FINANCIAL ASSETS, LLC,

Defendant - Appellant.

---

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Dever III, District Judge. (5:20-cv-00185-D)

---

Argued:  December 7, 2022                    Decided:  February 15, 2023

---

Before THACKER, HARRIS, and HEYTENS, Circuit Judges.

---

Affirmed by published opinion. Judge Heytens wrote the opinion in which Judge Thacker and Judge Harris joined.

---

**ARGUED:** Matthew Nis Leerberg, FOX ROTHSCHILD LLP, Raleigh, North Carolina, for Appellant. Lauren Elizabeth Fussell, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Matthew W. Krueger-Andes, FOX ROTHSCHILD LLP, Charlotte, North Carolina; Aaron Z. Tobin, CONDON TOBIN SLADEK THORNTON, PLLC, Dallas, Texas, for Appellant. Camden R. Webb, Alexander M. Gormley, WILLIAMS MULLEN, Raleigh, North Carolina, for Appellee.

TOBY HEYTENS, Circuit Judge:

This appeal is governed by North Carolina law and raises two questions. First, did the district court err in granting summary judgment for Colorado Bankers Life Insurance Company in its suit against Academy Financial Assets for violating a loan agreement? Second, did the district court err in concluding a North Carolina statute requires Academy to pay 15% of the outstanding loan balance as attorneys' fees? Seeing no error, we affirm the district court's judgment.

I.

Colorado Bankers is a life, accident, and health insurance company. At all relevant times, its controlling shareholder was Greg Lindberg.

In June 2019, Colorado Bankers made several interrelated agreements with Lindberg and various other Lindberg-controlled entities, including Academy. The relevant ones here are a memorandum of understanding (MOU) and a revolving credit agreement (revolver). The MOU provided for the restructuring of various Lindberg-controlled entities, including Academy.

Under the revolver, meanwhile, Academy could borrow up to $40 million from Colorado Bankers. The revolver detailed several events that would constitute default, including the MOU's failure to become effective by March 31, 2020, or Academy's failure to pay back any outstanding principal or interest by June 30, 2020. The revolver also established various consequences for default. For example, Colorado Bankers would have the right to accelerate the loan and declare all principal and interest payable immediately. Moreover, Academy would have to pay various fees, including:

all out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of outside counsel and the allocated cost of inside counsel) incurred by [Colorado Bankers] in connection with the enforcement or protection of its rights in connection with [the revolver].

JA 554–55.

Within a few months, Academy exhausted almost the entire credit line. On March 31, 2020, Academy defaulted for the first time when the MOU failed to come into effect. The next day, Colorado Bankers accelerated the full outstanding balance and filed a breach of contract suit in state court seeking more than $40 million in damages, including the principal and accrued interest. Academy removed the case to federal court based on diversity jurisdiction. See 28 U.S.C. § 1441(a). After Academy failed to pay the still-outstanding balance in full by the June 30 maturity date, Colorado Bankers filed an amended complaint adding a second breach of contract claim.

Academy did not deny the revolver was a valid contract or that it had breached the contract. Instead, Academy asserted various "affirmative defenses seeking to excuse its performance and contend[ed] that genuine issues of material facts exist[ed] concerning whether [Colorado Bankers] failed to mitigate damages, obstructed the purposes of the agreement, waived payment, or committed a prior material breach." JA 719. The district court concluded Academy failed to raise a genuine dispute of material fact about any of its affirmative defenses. The court also determined that because the revolver "allows for reasonable attorneys' fees and does not specify a percentage," a North Carolina statute required a fee award of 15% of the outstanding loan balance without regard to "the attorneys' actual billings or usual rates." JA 725. The district court thus granted summary

3

judgment for Colorado Bankers, and determined Colorado Bankers was entitled to just under $40 million in damages; just under $5 million in prejudgment interest; and just over $6 million in attorneys' fees.

## II.

We hold the district court correctly granted summary judgment for Colorado Bankers.

"We review a district court's grant of a motion for summary judgment de novo, applying the same legal standards as the district court." *Nader v. Blair*, 549 F.3d 953, 958 (4th Cir. 2008). In opposing Colorado Bankers' summary judgment motion, Academy relied solely on affirmative defenses on which it would bear the burden of proof at trial. See *Bartels v. Saber HealthCare Grp., LLC*, 880 F.3d 668, 681 (4th Cir. 2018) ("The party asserting an affirmative defense bears the burden of proving it."); see also *Wells Fargo Ins. Servs. USA, Inc. v. Link*, 827 S.E.2d 458, 472 (N.C. 2019) (breach established by showing existence of a valid contract and violation of its terms). So once Colorado Bankers met its "initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of" the record it believed "demonstrate[d] the absence of a genuine issue of material fact," the burden shifted to Academy to identify "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (quotation marks omitted); see *Addax Energy SA v. M/V Yasa H. Mulla*, 987 F.3d 80, 85 (4th Cir. 2021) (defendant who asserts affirmative defense in opposing a summary judgment motion "must show that there is a genuine dispute of material fact").

4

Like the district court, we conclude Academy created no genuine dispute of material fact about its affirmative defenses. Academy insists Colorado Bankers failed to mitigate its damages and obstructed Academy's contract performance by declining to approve several third-party financing options supposedly available to Academy, which would have (the argument goes) enabled Academy to repay the loan. Academy criticizes the district court for ignoring these purported proposals and for failing to determine whether Colorado Bankers acted reasonably in rejecting them.

But there was nothing for the district court to consider. Academy's assertions that the financing options existed were based on testimony from Greg Lindberg, who controlled both Colorado Bankers and Academy during the relevant period. During his deposition, Lindberg made vague remarks that various companies were offering "tens of millions of dollars" in financing. JA 140–41. Sometimes, Lindberg was more specific about the offered sums, stating, for example, that an asset management company "was willing and able to lend" "$700 million." JA 288–89.

That was it. And in response to Colorado Bankers' summary judgment motion, Academy provided no details about the proposals Lindberg referenced—including the dates or terms of any offers, the existence (or lack) of subordination clauses, or the timelines for distributing any funds.

This lack of detail matters. Under North Carolina law, "the burden is on the breaching party [here, Academy] to prove that the nonbreaching party [here, Colorado Bankers] failed to exercise reasonable diligence to minimize the loss." *Isbey v. Crews*, 284 S.E.2d 534, 538 (N.C. Ct. App. 1981). In addition, a nonbreaching party "need not

5

pursue a particular corrective measure if a reasonable person would conclude the measure was imprudent, impractical, or would likely be unsuccessful." *Smith v. Childs*, 437 S.E.2d 500, 507–08 (N.C. Ct. App. 1993). And to make out a successful prevention of performance defense, the conduct of the allegedly obstructing party "must be wrongful, and, accordingly, in excess of his legal rights." *Goldston Bros. v. Newkirk*, 64 S.E.2d 424, 427 (N.C. 1951).

To avoid summary judgment based on its affirmative defenses, then, it was not enough for Academy to create a genuine dispute about whether refinancing offers existed. Instead, Academy needed to raise triable issues about whether any such offers could have prevented a breach of the revolver, mitigated damages, or enabled repayments *and* whether the offers' terms were sufficiently favorable that it would have been unreasonable or wrongful for Colorado Bankers to withhold its approval. See *Sedar v. Reston Town Ctr. Prop., LLC*, 988 F.3d 756, 761 (4th Cir. 2021) (factual dispute is only genuine and therefore capable of precluding a grant of summary judgment "if the evidence offered is such that a reasonable jury might return a verdict for the non-movant"). Academy failed to do so. Indeed, Lindberg's vague assertion about alternative financing arrangements represents precisely the sort of "conclusory testimony" that is, "without more, . . . insufficient to preclude granting [a] summary judgment motion." *Wai Man Tom v. Hospitality Ventures LLC*, 980 F.3d 1027, 1041–42 (4th Cir. 2020).

### III.

We also hold the district court did not err in awarding Colorado Bankers 15% of the outstanding loan balance as attorneys' fees.

6

This Court reviews a district court's grant of attorneys' fees for abuse of discretion, but "legal determinations justifying an award . . . are reviewed de novo*." Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 754 (4th Cir. 2016). Because this case comes down to the proper interpretation of a North Carolina statute, we review the district court's conclusion de novo. See *Salve Regina Coll. v. Russell*, 499 U.S. 225, 231 (1991) ("a court of appeals should review *de novo* a district court's determination of state law").

In North Carolina, a prevailing party is not entitled to attorneys' fees unless expressly authorized by statute. See *Hicks v. Albertson*, 200 S.E.2d 40, 42 (N.C. 1973). As relevant here, North Carolina General Statute § 6-21.2 makes "[o]bligations to pay attorneys' fees upon any . . . evidence of indebtedness . . . valid and enforceable . . . subject to" certain "provisions" set forth in the rest of the statute.

This case requires us to interpret the relationship between two of those provisions. The first—Subsection 1—addresses circumstances where the "evidence of indebtedness provides for attorneys' fees in some specific percentage of the 'outstanding balance.'" N.C. Gen. Stat. § 6-21.2(1). In that situation, "such provision and obligation shall be valid and enforceable up to but not in excess of fifteen percent (15%) of said 'outstanding balance' owing on said note, contract or other evidence of indebtedness." *Id.* Subjection 2, in contrast, applies if the "evidence of indebtedness provides for the payment of reasonable attorneys' fees by the debtor, without specifying any specific percentage." § 6-21.2(2). In that case, "such provision shall be construed to mean fifteen percent (15%) of the 'outstanding balance' owing on said note, contract or other evidence of indebtedness." *Id.*

7

Based solely on the statutory language, this case looks straightforward. Because the revolver obligates Academy to pay Colorado Bankers' attorneys' fees without "specifying any specific percentage," N.C. Gen. Stat. § 6-21.2(2), this case appears to be governed by Subsection 2. And, if so, it appears the district court was correct in making a fee award of "fifteen percent (15%) of the 'outstanding balance'" without requiring any other evidence from Colorado Bankers. *Id.*

To be sure, the final word about what a state law means rests with the State's highest court. See *Gurley v. Rhoden*, 421 U.S. 200, 208 (1975) ("a State's highest court is the final judicial arbiter of the meaning of state statutes"). Colorado Bankers suggests the Supreme Court of North Carolina addressed this issue in 1997, when it summarily affirmed a decision by the North Carolina Court of Appeals that described Subsection 2 as a "statutory mandate" requiring neither "evidence" nor "findings of fact supporting the reasonableness of" a 15% fee award. *Trull v. Central Carolina Bank & Tr.*, 478 S.E.2d 39, 44 (N.C. Ct. App. 1996), aff'd, 490 S.E.2d 238 (N.C. 1997) (per curiam).

We disagree. Under North Carolina procedure, when an appeal of right depends solely on a dissent—the situation in *Trull*—"review by the Supreme Court is limited to a consideration of those issues that are . . . specifically set out in the dissenting opinion as the basis for that dissent." N.C. R. App. P. 16(b). Because the dissenting opinion in *Trull* did not address the relationship between Subsection 1 and Subsection 2 or whether Subsection 2 requires proving the reasonableness of a fee award, see *Trull*, 478 S.E.2d at 44 (Walker, J., concurring in part and dissenting in part), those issues were not before the Supreme Court of North Carolina.

8

Lacking direct guidance, we must "predict" how the Supreme Court of North Carolina "would rule if presented with the issue." *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). In doing so, the decisions of intermediate appellate courts "constitute the next best indicia of what state law is." *Id.* (quotation marks omitted). Unlike those of the State's highest court, however, such decisions are never binding and "may be disregarded if the federal court is convinced by other persuasive data that the highest court of the state would decide otherwise." *Id.* (quotation marks omitted).

The problem here is that North Carolina's intermediate appellate court appears to have tackled this issue in conflicting ways. It is true that the North Carolina Court of Appeals has applied Subsection 1 to an agreement containing no percentage but providing for reasonable fees "but not more than such attorneys' usual hourly charges for the time actually expended." *Barker v. Agee*, 378 S.E.2d 566, 570 (N.C. Ct. App. 1989), aff'd in part, rev'd in part on other grounds, 389 S.E.2d 803 (N.C. 1990). But the same court has also stated a trial court "correctly chose to apply" Subsection 2 to a contract that did not specify a percentage and provided for "reasonable attorneys' fees" which "shall be such as to fully reimburse all attorneys' fees reasonably incurred." *North Carolina Indus. Cap., LLC v. Clayton*, 649 S.E.2d 14, 23 (N.C. Ct. App. 2007). Likewise, Academy is right that North Carolina's intermediate appellate court has described Subsection 2 as setting a "statutory *ceiling* of fifteen percent" and affirmed fee awards of less than 15% under that provision. *Telerent Leasing Corp. v. Boaziz*, 686 S.E.2d 520, 523–24 (N.C. Ct. App. 2009) (emphasis added). But that same court has also—and not just in *Trull*—described

9

Subsection 2 as having "predetermined that 15% is a reasonable amount" and rejected arguments that a plaintiff must provide "evidence of what percentage will be reasonable in" cases covered by that provision. *RC Assocs. v. Regency Ventures, Inc.*, 432 S.E.2d 394, 397 (N.C. App. 1993).[*]

Academy insists the various decisions can be reconciled and, in any event, the ones favoring its position are "the controlling precedent" under the North Carolina courts' approach to stare decisis. Academy Reply Br. 21. Academy also insists "[t]he weight of recent cases in lower courts"—specifically decisions by federal district and bankruptcy courts—supports its views. Academy Br. 42 (quotation marks omitted).

But all of this is taking us rather far afield. Our task is not to determine how North Carolina's intermediate appellate court would—or should—resolve any tension within its own precedent. Nor is it to tally up the decisions supporting one position or the other. Instead, because "North Carolina currently has no mechanism for us to certify questions of state law," *Town of Nags Head v. Toloczko*, 728 F.3d 391, 398 (4th Cir. 2013), our job is to predict—as best we can—how the Supreme Court of North Carolina would rule if presented with the issues before us.

---

[*] Academy employs selective editing in asserting the North Carolina Court of Appeals has described Subsection 2 as "'a fall-back only,' should the parties not provide their own methodology." Academy Br. 43 (quoting *Coastal Prod. Credit Ass'n v. Goodson Farms, Inc.*, 319 S.E.2d 650, 654 (N.C. Ct. App. 1984)). What that decision said is that the legislature "apparently intended" that Subsection 2 operate "as a fall-back only in case the agreement contained nothing regarding the parties' intent *as to what constituted a reasonable percentage.*" *Id.* (emphasis added). Indeed, that decision states Subsection 2 "becomes operative" only when a contract "fail[s] to specify *any* percentage" (*id.*), which is precisely the situation here.

Without clearer guidance, we predict North Carolina's highest court would follow its repeated admonitions that "[s]tatutory interpretation properly begins with an examination of the plain words of the statute." *JVC Enters., LLC v. City of Concord*, 855 S.E.2d 158, 161 (N.C. 2021) (quotation marks omitted). We also think this is a situation when that court would say it must "give effect to the plain meaning of the statute, and judicial construction of legislative intent is not required." *Matter of J.E.B.*, 853 S.E.2d 424, 428–29 (N.C. 2021) (quotation marks omitted).

This statute's plain words divide the world into two types of fee-shifting provisions: those that "provide[] for attorneys' fees in some specific percentage of the 'outstanding balance'" and those that "provide[] for the payment of reasonable attorneys' fees . . . without specifying any specific percentage." N.C. Gen. Stat. § 6-.21.2(1)–(2). Because the revolver provides for "the reasonable fees, charges and disbursements of outside counsel and the allocated cost of inside counsel," JA 554–55, without mentioning any specific percentage, it is governed by Subsection 2. Subsection 2, in turn, provides the revolver "*shall* be construed to mean" that Academy is required to pay "fifteen percent (15%) of the 'outstanding balance'" as attorneys' fees. N.C. Gen. Stat. § 6-21.2(2) (emphasis added). It is "well established" in North Carolina "that the word 'shall' is generally imperative or mandatory," *Multiple Claimants v. North Carolina Dep't of Health & Hum. Servs.*, 646 S.E.2d 356, 360 (N.C. 2007), and here the inference is strengthened by the legislature's use of "up to but not in excess of fifteen percent (15%)" in the directly neighboring Subsection 1. The district court thus did not err in imposing a 15% fee award.

11

Academy offers two responses, but neither is persuasive. Academy's first argument is that Subsection 2 "has no application here . . . because the parties spelled out what fees could be shifted—out-of-pocket expenses—and in which circumstances." Academy Br. 15. That approach has no basis in the statutory text. True, as Academy points out, the introductory language to N.C. General Statute § 6-21.2 provides that private agreements to shift fees are "valid and enforceable." See Oral Arg. 2:24–3:00. The problem, however, is the same provision later clarifies such agreements are *only* valid and enforceable "subject to the following provisions," which include Subsections 1 and 2. N.C. Gen. Stat. § 6-21.2; see *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 36 (2012) ("[T]he first rule of . . . statutory interpretation is: Read on."). In short, the statutory text provides no basis for enforcing a fee-shifting agreement without considering either Subsection 1 or Subsection 2.

Shifting gears, Academy insists this case is governed by *both* Subsections. According to this version of the argument, Subsection 2 establishes only a rule of construction by stating a fee shifting clause containing no percentage "shall be construed" as containing a 15% cap, N.C. Gen. Stat. § 6-21.2(2), at which point a court must return to Subsection 1 to determine the amount of fees that is ultimately permissible. Academy further insists Subsection 1 not only renders unenforceable any contractual provision setting fees "in excess of fifteen percent (15%)," § 6-21.2(1)—it *also* directs courts to require documentation and make a reasonableness finding supporting any fee award, no matter what the contract says.

12

Although we acknowledge various federal district and bankruptcy courts have adopted this view, we decline to do so. While perhaps appealing as a policy matter, Academy's argument has scant basis in the statutory text, and Academy has identified no compelling reason for concluding the Supreme Court of North Carolina would interpret the statute in such an atextual manner. We thus hold the district court did not err in following the plain language of the statute and imposing a 15% fee award without requiring evidence of "the attorney's actual billings or usual rates." JA 725.

\*     \*     \*

It is certainly possible the Supreme Court of North Carolina would see matters differently than we have. But Academy is the party that chose a federal forum by removing Colorado Bankers' suit from state court to federal court, so we must do our best to predict what North Carolina's highest court would do. Having done so, the district court's judgment is

*AFFIRMED.*

13