Lawrence F. LEE, Jr., et al.,
Plaintiffs-Appellants,

v.

NAVARRO SAVINGS ASSOCIATION,
Defendant-Appellee.

No. 76–3550.

United States Court of Appeals,
Fifth Circuit.

June 18, 1979.

Rehearing and Rehearing En Banc
Denied Aug. 1, 1979.

James A. Ellis, Jr., Don R. Hanmer, Dallas, Tex., for plaintiffs-appellants.

Ernest E. Figari, Jr. (Institutional Investors Trust), David P. Seikel, Dallas, Tex., amicus curiae.

Bernus W. Fischman, Houston, Tex., Lawrence Fischman, Dallas, Tex., for defendant-appellee.

Before BROWN, Chief Judge, and AINSWORTH and VANCE, Circuit Judges.

AINSWORTH, Circuit Judge:

The question for decision is whether the district court correctly dismissed this suit for lack of jurisdiction.

Plaintiffs are eight individuals, all non-Texas citizens and trustees of Fidelity Mortgage Investors, a Massachusetts business trust (FMI), who filed this complaint as representatives of FMI seeking damages for breach of contract against defendant Navarro Savings Association, a Texas corporation, in the sum of $1,174,525.17 plus interest and attorneys' fees.

Jurisdiction is asserted by plaintiffs under both the diversity of citizenship and federal question provisions of law. 28 U.S.C. §§ 1332, 1331. The district court rejected both bases of citizenship.[1] We disagree with the district court's ruling and hold that jurisdiction should have been maintained under diversity of citizenship. It is thus unnecessary that we consider whether there is also federal question jurisdiction.

According to the allegations contained in plaintiffs' complaint, on September 9, 1971, the president of Rockwall Estates, Inc. executed on behalf of the corporation a promissory note to plaintiffs in the amount of $850,000 to evidence money lent to the corporation. The note provided that the principal amount should become due and payable two years from the date thereof but interest payments were to be due and payable monthly. The promissory note provided in pertinent part as follows:

FOR VALUE RECEIVED, the undersigned Rockwall Estates, Inc., (hereinafter sometimes referred to as "Maker"), hereby promises to pay to the order of Laurence F. Lee, Jr., Bert A. Betts, Roy B. Davis, Jr., N. Clement Slade, Jr., Robert M. Green, Luther H. Hodges, James B. McIntosh, Arthur W. Milam, Jack H. Quaritius, Frederick H. Schroeder and John W. York, not individually, but as Trustees of Fidelity Mortgage Investors, a Massachusetts Business Trust, under Declaration of Trust dated May 29, 1969 (hereinafter referred to as "FMI") and their respective successor Trustees under said Declaration of Trust, with power to protect, manage, sell, deliver, transfer, endorse with or without recourse, modify, extend, consolidate, coordinate and spread with any other note, negotiate, collect, discharge, accelerate, enforce and/or without being limited by any of the foregoing deal in any manner with this note, the obligations represented thereby, and exercise any right or option contained in this note, the principal sum of Eight Hundred Fifty Thousand and 00/100 ($850,000.00) Dollars, or so much thereof that may be advanced, together with interest thereon from the date of advances on outstanding principal balance at the rate of five percent (5%) above the prime rate of interest charged by Morgan Guaranty Trust Company of New York, or its successors, on the busi-

---

1. The district court in a written opinion held that the citizenship of each of the numerous shareholders of the trust rather than the eight trustee plaintiffs was determinative of jurisdiction and diversity of citizenship was therefore lacking. Other contentions of plaintiffs relative to the right to maintain a class action under Federal Rules of Civil Procedure, Rule 23.2 (pertaining to actions by representative parties on behalf of members of an unincorporated association), and to federal question jurisdiction under the Securities Exchange Act of 1934, were also denied.

ness day preceding the first day of each successive month during the term hereof, but shall in no case be in excess of one and one/half percent (1½%) per month.

According to the allegations of plaintiffs' suit, prior to and contemporaneously with the execution of the promissory note described, defendant Navarro Savings Association of Dallas, Texas, acting through its president, executed loan commitment letters to Rockwall Estates, Inc. dated July 26, 1971, which were delivered and accepted by Rockwall's president at the closing of the loan by FMI to Rockwall Estates, Inc. on September 9, 1971. Under these "take out" commitment letters defendant Navarro agreed to loan to Rockwall Estates, Inc. $850,000 any time between September 8, 1973 and August 31, 1974 "so that such sum could be used by Rockwall Estates, Inc. to pay to Plaintiff the sums due under the note to them."[2]

Plaintiffs also alleged that on August 5, 1971, the president of defendant Navarro sent to FMI through Ronald L. Langley for its advisors a letter agreement (attached as an exhibit) which provided that Navarro would either purchase the Rockwall mortgage note of $850,000 or make available funds for additional loan at any time the note becomes delinquent. It was further alleged that on September 9, 1971, at the closing of the loan by FMI to Rockwall, the president of defendant Navarro executed and delivered the loan commitment letters and orally stated to FMI's representative that the commitment fee had been actually received by Navarro. Thereafter, on September 10, 1971, the president of Rockwall assigned in writing the commitment letters and obligations of defendant Navarro to

**2.** The pertinent Navarro Savings Association commitment letter to Rockwall Estates, Inc. dated July 26, 1971, which was accepted by Rockwall Estates, Inc. on September 9, 1971, reads in part as follows:

1. *Commitment.* Subject to and upon the terms and conditions contained herein, and in consideration for the payment to Navarro Savings Association ("Association"), of the sum of Eight Thousand Five Hundred Dollars ($8,500.00) as a commitment fee, Association hereby agrees to loan to Rockwall Estates, Inc., a Texas corporation, ("Borrower"), at any time during the period from and after September 8, 1973, and until and including August 31, 1974, the principal sum of Eight Hundred Fifty Thousand Dollars ($850,-000.00) (the "Loan").

2. *Note and Deed of Trust.* The indebtedness arising pursuant to the Loan shall be evidenced by a promissory note (the "Note"), executed by Borrower, dated the day the Loan is made (the "Funding Date"), in principal amount of the Loan, bearing interest at a rate equal to the lesser of (a) a rate per annum of five per cent (5%) over the prime rate being charged by the Chase Manhattan Bank (National Association) on the Funding Date or (b) one and one-half per cent (1½%) per month, on the unpaid principal balance from time to time remaining, with accrued interest payable quarterly and with principal and all accrued interest being finally due and payable two (2) years after the Funding Date. The Note shall be secured by a deed of trust (the "Deed of Trust") covering the real property, described on Exhibit "A" attached hereto and all improvements, fixtures and personal property situated thereon (the "Mortgaged Property"), granting to Association a valid, legal and enforceable first and prior lien and security interest on the Mortgaged Property, subject to no liens, restrictions, encumbrances, easements or other exceptions to title except those approved in writing hereafter by Association. The Note and Deed of Trust shall be substantially in the form of Exhibits "B" and "C" attached hereto and incorporated herein by reference (with appropriate blanks therein completed correctly).

8. *Pledge of Commitment.* This Commitment and the proceeds therefrom may be pledged by Borrower or a security interest may be granted by Borrower therein, but in no event shall Association be required to perform this commitment except in accordance with its terms.

9. In the event this Commitment is pledged as security for a loan to Borrower from Fidelity Mortgage Investors under the terms of the commitment letter from Fidelity Mortgage Investors dated August 6, 1971, the holder of such loan, upon thirty (30) days written notice, may require Association to make the loan committed hereby prior to September 8, 1973; provided, however, at the time of such notice and at the time of closing of the loan, Borrower must have been delinquent for more than sixty (60) days in the payment of installments due on the loan from Fidelity Mortgage Investors and Borrower must have complied with all the terms and provisions of this Commitment.

FMI. It is alleged that it was upon reliance of the assignment and commitment letters that the loan of $850,000 was made by FMI to Rockwall.

Plaintiffs further alleged that when Rockwall Estates, Inc. became sixty days' delinquent in the payment of installments due on its loan to FMI, FMI gave defendant Navarro notice to make the loan covered by its commitment, but Navarro "breached its obligation under the commitment to make the loan in question" causing FMI to foreclose on the Deed of Trust on real estate securing the note, and resulting in damages and a deficiency to plaintiffs in the amount of $174,525.17 plus interest and attorneys' fees as provided in the note plus $1,000,000 punitive and exemplary damages.

The allegations in the suit of plaintiffs, trustees of FMI, disclose that under Article III of the Declaration of Trust, "Trustees' Power," the trustees have the following general power (3.1):

> The Trustees shall have, without other or further authorization, *full, absolute and exclusive power, control and authority over the Trust Estate* and of the business and affairs of the Trust, *free from any power and control of the Shareholders,* to the same extent as if the Trustees were the sole owners of the Trust Estate in their own right, subject only to the limitations contained in this Declaration. The Trustees may do and perform such acts and things as in their sole judgment and discretion are necessary and proper for carrying out the purposes of the Trust or conducting its business and affairs. The enumeration of specific powers shall not be construed as limiting the exercise of general powers or any other specific power. Such powers of the Trustees may be exercised without order of or resort to any court.

(emphasis supplied)

Article III, "Specific Powers," (3.2r) of the Declaration provides that the powers of the trustees shall include the power "[t]o collect, sue for and receive all sums of money coming due to the Trust, and to prosecute, join, defend, compromise, abandon, or adjust, any actions, suits, claims, demands or other litigation relating to the Trust, the Trust Estate or the Trust's affairs."

Article I of the Declaration of Trust (1.1) states in part that "the Trustees shall conduct and transact the activities of the Trust, make and execute all documents and instruments and sue and be sued in the name of the Trust or in their names as Trustees of the Trust."

A careful review of the Declaration of Trust, as indicated above, amply supports plaintiffs' contention that as trustees of FMI they are the real parties at interest, exclusively entitled to enforce the rights at issue in this case. In addition to the powers already enumerated, plaintiffs as trustees have absolute power to invest the capital and funds of the trust, to lend money, and to possess and exercise the rights incident to the ownership of mortgage loans. *See* Declaration of Trust, Article 3.2(a), (b), (c), (g) and (k). Article IV states that the trustees are "responsible for the general policies of the Trust and for such general supervision of the business of the Trust conducted by officers, agents, employees, investment advisers or independent contractors of the Trust as may be necessary to insure that such business conforms to the provisions of this Declaration."

On the other hand, the shareholders' rights are extremely limited, since they are entitled only to the rights of equitable interest owners or beneficiary shareholders, without any powers of control or management whatsoever. For example, Article 6.2, "Rights of Shareholders," in the Declaration reads in pertinent part as follows:

> The Shareholders shall have no legal right, title or interest in or to the Trust Estate and shall have no right to a partition thereof during the continuance of the Trust. Shareholders shall, however, be the equitable beneficiaries of the Trust, but shall have only the rights provided for in this Declaration and in the Trustees' Regulations. Except with respect to matters in which the Shareholders are specifically given the right to vote by this Declaration, no action taken by

the Shareholders at any meeting shall in any way bind the Trustees.

Thus, according to the allegations of the suit and accompanying exhibits, it is apparent that the general and specific powers relating to the management and control of the FMI trust repose in the eight trustees who are plaintiffs in this suit. The Declaration of Trust could not be more specific in this regard. Likewise, the Rockwall promissory note of $850,000 was specifically made payable to the order of the eight trustees, plaintiffs herein, in their capacities as trustees of FMI under the Declaration of Trust.

The effect of the district court's holding that the citizenship of each of the shareholders must be considered rather than the citizenship of the individual trustees, in practical effect, denies access to the federal courts of a business trust under diversity of citizenship jurisdiction since it is virtually impossible to establish the citizenship of each of the approximately 9,500 beneficiary shareholders.

Since the eight plaintiff trustees who are charged with the power to sue and be sued on behalf of the trust, and who are the persons in actual control of the trust and the real parties in interest, are citizens of a state other than Texas, and Navarro Savings is a citizen of Texas, there is complete diversity between plaintiffs and defendant. We look, therefore, to the citizenship of the plaintiff trustees, not to that of the beneficiary shareholders, to discern diversity of citizenship in this case for purposes of jurisdiction.

The Declaration of Trust clearly and unequivocally states that the real parties in interest in matters affecting the FMI trust are the named trustees. Their right to prosecute the action is also provided by the Federal Rules of Civil Procedure, Rule 17(a), which reads in pertinent part as follows:

> Every action shall be prosecuted in the name of the real party in interest. An executor, administrator, guardian, bailee, *trustee of an express trust*, a party with whom or in whose name a contract has been made for the benefit of another, or a party authorized by statute may sue in his own name without joining with him the party for whose benefit the action is brought; and when a statute of the United States so provides, an action for the use or benefit of another shall be brought in the name of the United States.

(emphasis supplied)

Thus, under the Federal Rules of Civil Procedure the trustee of an express trust may sue in a representative capacity on behalf of the trust. FMI is not a party to these proceedings. The trustees of the trust are the plaintiffs, all of whom are of non-Texas citizenship. It is unnecessary, therefore, to look beyond the terms of the Declaration of Trust, the provisions of the promissory note, and the Federal Rules of Civil Procedure to determine that the true parties in interest in this case, in exclusive control of the trust, with the sole right to bring this action, are the eight trustee plaintiffs.

The trust here is analogous to a limited partnership, and the citizenship of its beneficiary shareholders should not be counted in determining the existence of diversity jurisdiction. The citizenship of the shareholders should be disregarded in the same manner as was done by the Second Circuit in *Colonial Realty Corp. v. Bache & Co.,* 1966, 358 F.2d 178, 184 (Friendly, J.), *cert. denied,* 385 U.S. 817, 87 S.Ct. 40, 17 L.Ed.2d 56 (1966), where the Court held that "a suit brought against a New York partnership must thus be considered to be against the general partners only and identity of citizenship between a limited partner and the plaintiff does not destroy diversity." [3]

The Comment, *Limited Partnerships and Federal Diversity Jurisdiction,* 45 U.Chi.L. Rev. 384, 407, states the real party in interest principle very succinctly:

> Thus, the principle unifying the apparently conflicting jurisdictional precedents

---

**3.** *Contra, Carlsberg Resources Corp. v. Cambria Savings & Loan Association,* 3 Cir., 1977, 554 F.2d 1254; *Riverside Memorial Mausoleum, Inc. v. UMET,* 3 Cir., 1978, 581 F.2d 62.

is not the "persons composing" rule *but the "control" or "real party" concept.* The members of joint stock companies, limited partnership associations, and general partnerships "count" for diversity purposes because all the members exercise management powers. This control is manifested in several ways: in the management role of the respective members, their rights with respect to entity property, their ability to effect dissolution of the entity, their liability for the entity's debts and obligations, and in their capacity to sue and be sued on behalf of the entity. Corporate shareholders and *trust beneficiaries, in contrast, have only "equitable" interests in their respective entities.* Because limited partners do not enjoy the requisite control over the partnership, they have only an "equitable" interest in proceedings brought by or against the partnership, and thus, like corporate shareholders and *trust beneficiaries, should not be counted for diversity purposes.* The result in *Colonial Realty,* far from expanding the diversity jurisdiction, is but an application of a principle underlying the Supreme Court's diversity jurisdiction decisions over the past 125 years.

(emphasis supplied) (footnotes omitted) The same Comment discusses the holdings in the *Colonial Realty* and opposing *Carlsberg Resources* cases in the following reasoned manner:

> The Second Circuit, in *Colonial Realty Corp. v. Bache & Co.,* departed from the tradition of dogmatic application of the *Chapman-Great Southern* rule and held that in suits involving limited partnerships the citizenship of only the general partners is relevant for diversity purposes. The court relied on the statutory distribution of *rights, powers, and responsibilities* between the general and the limited partners in concluding that the latter should be disregarded in determining diversity. Although the decision has been followed by courts in the Second and

Fourth Circuits, the Third Circuit, in *Carlsberg Resources Corp. v. Cambria Savings & Loan Association,* reached a contrary result, finding that *Colonial Realty* was not a proper interpretation of the "persons composing" test, but an unwarranted expansion of the scope of diversity jurisdiction. The majority in *Carlsberg Resources* read the body of Supreme Court precedent as conclusively foreclosing an approach that would distinguish between classes of association members.

> Although the court in *Colonial Realty* did not fully develop the reasoning behind its decision, the result in that case stands on solid ground. Examination of *Chapman* and *Great Southern* reveals that those cases did not reject a distinction for jurisdictional purposes between classes of association members. On the contrary, the rationale for such a distinction can be culled from a comparison of the seemingly irreconcilable *Marshall* and *Chapman* decisions. In *Marshall* the Court observed that shareholders were not real parties to litigation involving a corporation and hence were irrelevant to the jurisdictional test. In *Chapman,* on the other hand, the joint stock company's shareholders were clearly the parties controlling the company, and their personal assets stood behind the company's debts. The characteristics that compelled reference to all the association members in *Chapman* are not found in the case of limited partners, who are analogous to corporate shareholders. *A jurisdictional test that looks to the real parties to the controversy not only makes sense of the diversity precedents, but also accords well with the protective policy underlying the diversity jurisdiction, a policy which remains vital today.*

*Id.* at 417–18 (emphasis supplied).[4]

It is pertinent to note that the two Supreme Court cases principally relied upon by the district court as authority for dis-

---

4. Citations of cases referred to in the text, not otherwise shown, are as follows: *Chapman v. Barney,* 129 U.S. 677, 9 S.Ct. 426, 32 L.Ed. 800 (1889); *Great Southern Fireproof Hotel Co. v.* *Jones,* 177 U.S. 449, 20 S.Ct. 690, 44 L.Ed. 842 (1900); *Marshall v. Baltimore & Ohio R.R.,* 57 U.S. (16 How.) 314, 14 L.Ed. 953 (1853).

missing this suit for lack of jurisdiction are inappropriate and inapposite. *United Steelworkers v. R. H. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965), cited by the district court as authority for its holding that the citizenship of each of the beneficiary shareholders is decisive for purposes of diversity jurisdiction, does not pertain to the circumstances here. In *Bouligny* the question was whether an unincorporated labor union should be treated as a citizen for purposes of federal jurisdiction without regard to the citizenship of its members, and the Court answered in the negative. However, we do not read in *Bouligny* a general rule that the courts must look to all unincorporated associations' membership to determine diversity jurisdiction. The present case differs on its facts from *Bouligny* since, under the express provisions of the Declaration of Trust here, the trustees are designated as the ones in exclusive control of the trust, with power to sue and be sued on behalf of the trust, and no such authority is conferred on the beneficiary shareholders. Additionally, the Rockwall promissory note here was made payable to the trustees who brought this suit.

*Bouligny* is applicable only to business associations which seek federal court diversity jurisdiction as entities. Here, the trustees sue as individual representatives of the trust, and assert federal jurisdiction as such. No attempt is made by the individual parties to become entities as occurred in *Bouligny*. We note that the opinion in *Bouligny* does not inform us who to look to as the relevant members of the association whose citizenship determines diversity jurisdiction. In *Bouligny* the Court was concerned with an unincorporated association having only one class of membership. In the instant case, our real-party-in-interest analysis notes that there is no single class of membership, all with equal rights to control and management such as in a general partnership. In the present case, another class, the trustees, has the exclusive control and management of the trust and the sole right to sue and be sued. To decide which class of membership or shareholders should be counted for diversity jurisdiction purposes, it is necessary on a case-by-case basis (there being no statutory model) to determine which class has exclusive power to control and manage the trust. Here, the trustees and their citizenship alone should be looked to for the purposes of determining if each of them is diverse from that of the defendant.[5] "[A] close reading of *Bouligny* suggests that the Court's language concerning the limitations of the judicial role can be restricted to the facts of the case. The Court's discussion of the difficulties of fashioning a test for labor union citizenship can be read as explaining why only Congress could extend citizenship to unions as entities." (footnote omitted) 45 U.Chi.L.Rev. 384, 392.[6]

---

5. *See* 13 Am.Jur.2d, Business Trusts § 98 (1964), which reads as follows:

   Jurisdiction of an action instituted in a federal court in the name of the trustees of a business trust will be governed by the residence of the trustees rather than the shareholders, even though the latter may have the beneficial interest and ultimate power of control of the business.

6. As the Comment in the Chicago Law Review states more explicitly:

   *Bouligny* should not be regarded as dispositive of all business trust cases. The determination of proper parties for diversity purposes should not turn on whether the entity is of a "business" character, but on the allocation of rights and liabilities between the beneficiaries and the trustees. Analysis of the cases from the perspective of the "real party" principle suggests that some of the recent *REIT* cases may have been decided incorrectly. If a beneficiary of a business trust is truly a passive investor who has no significant voice in the management of the trust, like the limited partner he should not be deemed a party to the action.[179] Trust *agreement terms that permit the beneficiaries to remove the trustees or to prevent transfers of trust property do not seem to vest the management of the trust in the beneficiaries;* such provisions only give beneficiaries certain powers that corporate shareholders commonly wield.[180]

   [179] Under the theoretical model of the business trust the role of the beneficiaries is clearly distinguishable from that of the shareholder in a joint stock company. The shareholders of a joint stock company choose and control the company's managers, who act as agents of the shareholders. Crane & Bromberg, *supra* note 32, at 179 n.19. Business trusts, on

Nor is the citation by the district court of *Morrissey v. Commissioner of Internal Revenue,* 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935), apposite. *Morrissey* involved the question of the taxing of a trust under existing statutory provisions. Diversity jurisdiction was not at issue. The Court held that the trust in *Morrissey* should be taxed in the same way as a corporation under the statutory provision which defined a corporation for tax purposes as including " 'associations, joint-stock companies and insurance companies.' " The business trust there was held to be an unincorporated association.[7]

Neither *Bouligny* nor *Morrissey,* therefore, controls the present case.

This suit is, therefore, maintainable under diversity jurisdiction. We are, of course, aware that the Judicial Conference of the United States, by appropriate resolution, has requested that Congress change the law so that federal courts may be divested of diversity jurisdiction. However, until Congress amends the statute in this regard the federal courts are obliged to take those suits properly before them as diversity cases. This is such a case. Accordingly, the judgment of the district court dismissing the suit for lack of jurisdiction is reversed and the case is remanded to the district court for trial on the merits.

REVERSED AND REMANDED.

VANCE, Circuit Judge, dissenting.

The issue presented is whether for purposes of diversity jurisdiction the citizenship of a business trust is determined by the citizenship of its trustees, rather than that of its beneficiary shareholders. The majority has elected to resolve this question by undertaking a "real party in interest" analysis.[1] Concluding that the better view would base such determination on the citizenship of each of the business trust's beneficiary shareholders, I dissent. This approach comports with the rule announced in *United Steelworkers v. R. H. Bouligny, Inc.,* 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965): an unincorporated association has as its citizenship the domicile of each of its individual members.

The business trust is analogous to an unincorporated association. Unlike an ordinary trust, a business trust is primarily an investment vehicle whose object

---

the other hand, are non-statutory variations of traditional trusts. The Supreme Court, in *Hecht v. Malley,* 265 U.S. 144 (1924), defined a business trust as "an arrangement whereby property is conveyed to trustees, in accordance with the terms of an instrument of trust, to be held and managed for the benefit of such persons as may, from time to time, be the holders of transferable certificates issued by the trustees . . . ." *Id.* at 146. The business trust differs significantly from both the joint stock company and the general partnership in that the beneficiaries are not co-owners of the trust property. Rowley & Sive, *supra* note 32, at 632, 634. Legal title to trust property is vested in the trustees, while the beneficiaries have equitable title only.

[180] These powers are also comparable to those which limited partners may wield consistently with their limited partner status under more liberal limited partnership acts. (footnotes included) *Id.* at 415 & nn. 179 & 180.

7. *Cf. Commissioner of Internal Revenue v. Horseshoe Lease Syndicate,* 5 Cir., 110 F.2d 748, 749, *cert. denied,* 311 U.S. 666, 61 S.Ct. 24, 85 L.Ed. 427 (1940); *see also Willowood Condominium Assn. v. HNC Realty Co.,* 5 Cir., 1976, 531 F.2d 1249, a case involving a REIT where diversity jurisdiction was held to be proper.

1. The mere fact that legal title is vested in the trustees does not establish that they are the real parties. Nor is the fact that under the declaration of trust the trustees are the parties entitled to enforce the right dispositive of the issue. A party cannot unilaterally confer subject matter jurisdiction on a federal court by declaring who is to represent the trust in legal actions. This court should look beyond mere appellations to determine who is a real party in interest. *See Miller v. Perry,* 456 F.2d 63 (4th Cir. 1972). The primary function of categorizing a party as real party is to insure that any judgment obtained by him will have its proper effect as res judicata. Advisory Committee's Notes, 39 F.R.D. 85. Here, a judgment obtained by the trustees would have no greater preclusive effect than a judgment secured by the beneficiary shareholders.

The majority's "real party in interest" analysis necessitates ad hoc determinations and leads to divergent results. In some instances, a trial judge may be forced to decide the merits of a case while determining the threshold jurisdictional issue.

is not to hold and conserve particular property, with incidental powers, as in the traditional type of trusts, but to provide a medium for the conduct of a business and sharing its gains.

*Morrissey v. Commissioner of Internal Revenue,* 296 U.S. 344, 357, 56 S.Ct. 289, 295, 80 L.Ed. 263 (1935). Although *Morrissey* was only concerned with the tax status of a business trust, it does provide insight into its business character:

> What, then, are the salient features of a trust—when created and maintained as a medium for the carrying on of a business enterprise and sharing its gains—which may be regarded as making it analogous to a corporate organization? A corporation, as an entity, holds the title to the property embarked in the corporate undertaking. Trustees, as a continuing body with provision for succession, may afford a corresponding advantage during the existence of the trust. Corporate organization furnishes the opportunity for a centralized management through representatives of the members of the corporation. The designation of trustees, who are charged with the conduct of an enterprise, who act "in much the same manner as directors," may provide a similar scheme, with corresponding effectiveness. Whether the trustees are named in the trust instrument with power to select successors, so as to constitute a self-perpetuating body, or are selected by, or with the advice of, those beneficially interested in the undertaking, centralization of management analogous to that of corporate activities may be achieved. An enterprise carried on by means of a trust may be secure from termination or interruption by the death of owners of benefi-

cial interests and in this respect their interests are distinguished from those of partners and are akin to the interests of members of a corporation. And the trust type of organization facilitates, as does corporate organization, the transfer of beneficial interests without affecting the continuity of the enterprise, and also the introduction of large numbers of participants. The trust method also permits the limitation of the personal liability of participants to the property embarked in the undertaking.

*Id.* at 359, 56 S.Ct. at 296. The court then concluded that the business trust was sufficiently like a corporation that in reality it constituted an association rather than a traditional trust. *Id.* at 360, 56 S.Ct. 289.

The majority correctly notes that *Bouligny* addresses only the issue of an unincorporated association's domicile for diversity purposes when the association sues as an entity. It refuses, however, to apply *Bouligny* where, as here, individuals sue as representatives of the entity. It seems to me that such an approach honors form over substance [2] and ignores the underlying rationale of *Bouligny*:

> pleas for extension of the diversity jurisdiction to hitherto uncovered broad categories of litigants ought to be made to the Congress and not to the courts.

*United Steelworkers v. R. H. Bouligny, Inc.,* 382 U.S. at 150–151, 86 S.Ct. at 275. If the decision in *Bouligny* were applied in this case, there is no alternative but to find that the citizenship of the beneficiary shareholders controls. This conclusion is in accord with *Riverside Memorial Mausoleum v. UMET Trust,* 581 F.2d 62 (3rd Cir. 1978) and is supported by the overwhelming

---

**2.** Judge Hill, now a judge of this court, condemned the substitution of the trustees for the trust as named plaintiffs. As a district court judge he noted that:

> To say that diversity jurisdiction exists if the Trustees sue on behalf of the Trust, but does not exist if the Trust sues acting through the Trustees, is to honor form over substance and create problems where none now exist. If the Trustees may sue and create jurisdiction, then may one Trustee or two or fewer than all sue and establish jurisdiction? If the Trustees may sue on a promissory note, may

they sue on all contracts? For torts? The court is reinforced in its conclusion by the tone and philosophy expressed by the United States Supreme Court in *United Steelworkers of America, AFL–CIO v. R. H. Bouligny, Inc.,* 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965) to the effect that if diversity jurisdiction is to be extended to hitherto broad categories of litigants it ought to be done by the Congress and not the courts.
*Chase Manhattan Mortgage and Realty Trust v. Pendley,* 405 F.Supp. 593 (N.D.Ga.1975).

**430**

weight of authority provided by district court holdings. *Lincoln Associates, Inc. v. Great American Mortgage Investors,* 415 F.Supp. 351 (N.D.Tex.1976); *Chase Manhattan Mortgage and Realty Trust v. Pendley,* 405 F.Supp. 593 (N.D.Ga.1975); *Jim Walter Investors v. Empire-Madison, Inc.,* 401 F.Supp. 425 (N.D.Ga.1975); *Larwin Mortgage Investors v. Riverdrive Mall, Inc.,* 392 F.Supp. 97 (S.D.Tex.1975); *Independence Mortgage Trust v. White,* 446 F.Supp. 120 (D.Or.1978); *National City Bank v. Fidelco Growth Investors,* 446 F.Supp. 124 (E.D.Pa. 1978); *Heck v. A. P. Ross Enterprises, Inc.,* 414 F.Supp. 971 (N.D.Ill.1976); *Carey v. U. S. Industries, Inc.,* 414 F.Supp. 794 (N.D.Ill. 1976).