# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 21, 2016      Decided December 9, 2016

No. 12–7038

YUEH-LAN WANG, BY AND THROUGH HER ATTORNEY-IN-FACT,
WINSTON WEN-YOUNG WONG,
APPELLANT

v.

NEW MIGHTY U.S. TRUST, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:10–cv–01743)

*Mark W. Stoutenburg* argued the cause for the appellant. *Daniel S. Weinberger* was with him on brief. *Steven M. Chasin* entered an appearance.

*Clifford M. Sloan* argued the cause for the appellees. *David B. Leland*, *John Gardiner* and *Andrew Muscato* were with him on brief. *David E. Carney* entered an appearance.

Before: HENDERSON, KAVANAUGH and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LeCRAFT HENDERSON, *Circuit Judge*: This case presents the question of how to determine the citizenship of a trust for diversity subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a). In light of the United States Supreme Court's recent decision in *Americold Realty Trust v. ConAgra Foods, Inc.*, 577 U.S.__, 136 S. Ct. 1012 (2016), we conclude that a so-called "traditional trust" carries the citizenship of its trustees. We accordingly reverse the district court's Rule 12(b)(1) dismissal and remand for further proceedings. Fed. R. Civ. P. 12(b)(1). We also grant the plaintiff's pending motion to substitute as hereinbelow discussed.

## I. BACKGROUND

The facts giving rise to this lawsuit began over eighty years ago and thousands of miles away.[1] In 1935, Yueh-Lan Wang (Yueh-Lan)—in whose name this action was brought—married Yung-Ching Wang (Y.C.).[2] Perhaps presaging the advice given Dustin Hoffman's eponymous character in the 1967 movie *The Graduate*,[3] Y.C. went into plastics, founding the Formosa Plastics Group in 1954. He achieved tremendous success and, by the time of his death in

---

[1] Because the district court dismissed the complaint for lack of subject-matter jurisdiction, we take the facts alleged in the amended complaint as true, *see United States ex rel. Oliver v. Philip Morris USA Inc.*, 826 F.3d 466, 469 n.2 (D.C. Cir. 2016), and draw upon other documents as necessary, *see Am. Freedom Law Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016).

[2] Some of the parties have the surname "Wang" or "Wong." According to the complaint, the alternate spellings refer to the same Chinese-language surname.

[3] "I just want to say one word to you. Just one word . . . . Are you listening? . . . . Plastics."

2008, Y.C. was ranked by *Forbes* magazine as the 178th wealthiest person in the world with an estimated net worth of up to $6.8 billion. Although Y.C. remained married to Yueh-Lan over the course of his life, at the same time he had a number of children with two other women, Wang Yang Chiao[4] and P.C. Lee. Yueh-Lan helped to rear at least one of those children, Winston Wen-Young Wong (Winston), whose biological mother was Wang Yang Chiao. According to her will, Yueh-Lan considered Winston her son.

Y.C. died on October 15, 2008. Three years earlier, however, allegedly in an effort to reduce Yueh-Lan's share of the marital estate, Y.C. made various distributions and stock transfers to, *inter alia*, the New Mighty U.S. Trust (New Mighty), a trust formed under the laws of the District of Columbia to hold certain of Y.C.'s assets.[5] In an effort to account for and recover Yueh-Lan's share of the marital estate, Winston—a citizen of Taiwan and allegedly acting as Yueh-Lan's attorney-in-fact—brought suit in October 2010 against New Mighty, along with its trustee, Clearbridge, LLC, and the New Mighty Foundation, one of New Mighty's beneficiaries. Up to now, the case has had little to do with the legitimacy of Y.C.'s pre-2008 distributions.

In July 2011, the defendants moved to dismiss the complaint on a variety of grounds, including lack of diversity.

---

[4] The defendants refer to Wang Yang Chiao as Yang Jiao Wang. *See* Appellees' Br. 2.

[5] The amended complaint alleges that P.C. Lee and members of her family—without Y.C.'s knowledge—created several trusts, including New Mighty, in order to reduce Yueh-Lan's share of the marital estate. According to the amended complaint, the trusts resulted from the undue influence P.C. Lee and her family exerted on Y.C.

The district court concluded that a traditional trust (like New Mighty) is an artificial entity that "assumes the citizenship of all of its 'members' for purposes of diversity jurisdiction." *Wang ex rel. Wong v. New Mighty U.S. Tr.*, 841 F. Supp. 2d 198, 205 (D.D.C. 2012). Reasoning that New Mighty's "members" must include its beneficiaries, the court held that, because the amended complaint lacked allegations sufficient to establish the citizenship of at least some beneficiaries, subject-matter jurisdiction could not be determined. *Id.* at 206–07. Accordingly, the court instructed the defendants to produce a list of all beneficiaries and their citizenship. *Id.* at 208. The list revealed that New Mighty's beneficiaries included several entities that were citizens of the British Virgin Islands. As a result, complete diversity did not exist: defendant Clearbridge was a citizen of Virginia and the District of Columbia; defendant New Mighty Foundation was a citizen of Delaware and the District of Columbia and defendant New Mighty was then deemed a citizen of Delaware, the District of Columbia and the British Virgin Islands. With both an alien plaintiff and at least one alien defendant, the district court found diversity lacking. Winston sought reconsideration, arguing that the defendants had to show that the beneficiaries in fact received a distribution to qualify as beneficiaries under the trust and, therefore, their citizenship was irrelevant without such showing. In April 2012, the district court denied reconsideration. This appeal followed.

Shortly after the notice of appeal was filed, however, Yueh-Lan died. The appeal was held in abeyance and, consistent with this Court's instructions, Winston filed a series of reports on the status of legal proceedings underway in Taiwan to appoint an executor of Yueh-Lan's will. Eventually, three persons—Chen-Teh Shu, Dong-Xung Dai and Robert Shi—were designated joint executors. Winston and the executors moved to substitute the executors as

Yueh-Lan's personal representative pursuant to Federal Rule of Appellate Procedure 43(a)(1). The defendants opposed the motion, arguing that Winston was not the proper party to have initiated the lawsuit in the first place and that it should therefore be dismissed and the substitution motion denied. Both the substitution and dismissal motions were referred to this merits panel for disposition.[6] The questions before us, then, are whether the district court lacked subject-matter jurisdiction and whether the pending motion to substitute should be granted.

## II.  ANALYSIS

### A.  SUBJECT-MATTER JURISDICTION

"The judicial Power" of the United States "extend[s] . . . to Controversies . . . between a State, or the Citizens thereof, and foreign . . . Citizens . . . ." U.S. Const. art. III, § 2, cl. 1. Although the Congress has granted the district court jurisdiction of a civil action in which "the matter in controversy exceeds . . . $75,000 . . . and is between . . . citizens of a State and citizens or subjects of a foreign state," 28 U.S.C. § 1332(a) (2006), that provision—which requires "complete" diversity—does not reach disputes between aliens, *see Saadeh v. Farouki*, 107 F.3d 52, 54–55, 61 (D.C. Cir. 1997). This lawsuit was originally brought by Winston on behalf of Yueh-Lan, a Taiwanese. Whether diversity jurisdiction exists depends, first, on correctly identifying the defendants and, then, determining their citizenship.

---

[6] Shortly after that order issued, Winston and the executors filed an emergency motion to stay briefing pending the Supreme Court's *Americold* decision. The Court granted the motion and held the case in abeyance. Shortly thereafter, *Americold* was decided and, on Winston's and the executors' motion, the stay was lifted and a briefing schedule imposed.

**Supreme Court Precedent**

In determining a trust's citizenship, we were guided pre-*Americold* by the Supreme Court's decisions in *Navarro Savings Association v. Lee*, 446 U.S. 458 (1980), and *Carden v. Arkoma Associates*, 494 U.S. 185 (1990). Although neither case addressed the issue directly, both informed the Court's analysis in *Americold* and here, too, they provide a useful point of departure.

In *Navarro* the question was "whether the trustees of a business trust may invoke the diversity jurisdiction of the federal courts on the basis of their own citizenship, rather than that of the trust's beneficial shareholders." 446 U.S. at 458. In that case, the plaintiffs—eight individual trustees of Fidelity Mortgage Investors (Fidelity), "a business trust organized under Massachusetts law"—had lent $850,000 to a Texas firm. *Id.* at 459. In return, the Texas firm provided a promissory note payable to the plaintiffs as trustees. *Id.* The note was, in turn, partially secured by a commitment letter under which Navarro Savings Association (Navarro)—the defendant—agreed to lend the Texas firm $850,000 to cover the latter's obligation. *Id.* When the plaintiff trustees asked Navarro to make the loan, Navarro refused. *Id.* They brought suit in federal district court, invoking its diversity jurisdiction. *Id.* The district court, however, found diversity lacking. *Id.* at 460. In its view, the Massachusetts business trust was a citizen of every state in which its shareholders resided and, although defendant Navarro was a citizen of Texas and all eight plaintiff trustees were citizens of other states, some of Fidelity's shareholders were citizens of Texas and therefore defeated diversity. *Id.* On appeal, the Fifth Circuit reversed, reasoning that the trustees—and *not* Fidelity's beneficial shareholders—were "charged with the power to sue and be sued on behalf of the trust, . . . the persons in actual

control of the trust and the real parties in interest." *Lee v. Navarro Savs. Ass'n*, 597 F.2d 421, 425 (5th Cir. 1979). The Supreme Court affirmed. *Navarro*, 446 U.S. at 460. As the Court explained, the plaintiff trustees were the "real parties to the controversy," *id.* at 461, 465; "[t]hey ha[d] legal title; they manage[d] the assets; they control[led] the litigation[,]" *id.* at 465.

Navarro contended that Fidelity's "business trust" status "mask[ed] an unincorporated association of individuals who make joint real estate investments," *id.* at 461, and, therefore, as an unincorporated association made up of a "mere collection[] of individuals," *id.*, citizenship of those individuals "determines the diversity jurisdiction of a federal court," *id.* Although the Court concluded that it "need not reject the argument that Fidelity share[d] some attributes of an association," it determined that the litigation "involve[d] neither an association nor a corporation" but instead "an express trust." *Id.* at 462.

Despite its relatively plain holding that Fidelity's trustees—not its shareholders—were the real parties to the controversy, *Navarro* could arguably be read as also laying down a rule to determine the non-party *trust*'s citizenship—as was subsequently attempted in *Carden*. In *Carden*, plaintiff Arkoma Associates (Arkoma), a limited partnership organized under Arizona law, sued two individual defendants who were citizens of Louisiana, invoking diversity jurisdiction. 494 U.S. at 186. [7] The defendants unsuccessfully moved to dismiss, claiming that one of Arkoma's limited partners was a citizen of Louisiana. *Id.* The case proceeded to trial and, after Arkoma prevailed, the defendants appealed. *Id.* The

---

[7] Arkoma had both general and limited partners. *Carden*, 494 U.S. at 205–06 (O'Connor, J., dissenting).

Fifth Circuit affirmed, concluding that Arkoma's citizenship turned on that of its general partners alone, without regard to the citizenship of its limited partners. *Id.* at 187. The Supreme Court concluded otherwise. *Id.* at 198. It began by recognizing that complete diversity could exist under either of two scenarios. First, diversity could exist if a limited partnership is a "citizen" of the state that created it. *Id.* at 187. Second, diversity could exist if it depended on the citizenship of the general partners only. *Id.* The Court rejected both. It first determined that, with one exception,[8] the only state law-created artificial entity that can be treated as a citizen of that state under Supreme Court precedent is the corporation. *Id.* at 187–92. It rejected Arkoma's argument that *Navarro* prescribed a similar treatment for a trust. *Id.* at 191–92. *Navarro* "did not involve the question whether a party that is an artificial entity other than a corporation can be considered a 'citizen' of a State," the Supreme Court explained, but instead "the quite separate question whether parties that were undoubted 'citizens' (viz., natural persons) were the real parties to the controversy." *Id.* at 191. In then concluding that the citizenship of both the limited and the general partners of Arkoma counted, the Supreme Court rejected the notion that *Navarro* dealt with a *trust*'s citizenship. *Id.* at 192–96. To the contrary, "*Navarro* had nothing to do with the citizenship of the 'trust,' since it was a suit by the trustees in their own names." *Id.* at 192–93. The Court "adhere[d] to [its] oft-repeated rule that diversity jurisdiction in a suit *by or against the entity* depends on the citizenship of 'all the members,' 'the several persons composing such association,' 'each of its members.'" *Id.* at 195–96 (emphasis added) (citations omitted).

---

[8] The one exception is Puerto Rico's *sociedad en comandita*. *Carden*, 494 U.S. at 189–90.

The holdings in *Navarro* and *Carden* are clear enough: the citizenship of a Massachusetts business trust's trustees suing in their own names is the determinative citizenship, notwithstanding the non-party trust itself has some attributes of an unincorporated association, *Navarro*, 446 U.S. at 462, 465–66; and diversity in a suit by or against an "artificial entity" created under state law is determined by the citizenship of all of the entity's members, *Carden*, 494 U.S. at 195. Less clear is the reach of these holdings and various approaches to determining a trust's citizenship have proliferated. *See Emerald Investors Tr. v. Gaunt Parsippany Partners*, 492 F.3d 192, 201–03 (3d Cir. 2007) (collecting approaches).

The district court attempted to apply the *Navarro* and *Carden* holdings. *Wang*, 841 F. Supp. 2d at 203–05. Although it recognized that *Navarro* "could arguably be read to imply that when a trustee possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others, a court should refer only to the citizenship of the trustee," it also found significant *Carden*'s declaration that "'*Navarro* had nothing to do with the citizenship of the trust[.]'" *Id.* at 204 (citation and some internal quotation marks omitted) (quoting, *inter alia*, *Carden*, 494 U.S. at 192–93). Even if that language constituted dicta, the district court reasoned, *Carden* persuasively read *Navarro* to make clear that "[d]etermining which parties before the court are the real parties and determining the citizenship of a given party . . . are distinct questions." *Id.* at 205. Believing it faced the latter question because New Mighty was named as a party defendant, the district court turned to *Carden*'s membership test. *Id.* It used *Carden*'s "artificial entity" language, concluded that a

trust *is* an artificial entity and therefore thought it "clear that the *Carden* rule also applies to trusts." *Id.*[9]

After the district court's decision, the Supreme Court decided *Americold*. *Americold* involved a lawsuit brought by several corporations against the owner of an underground warehouse containing the corporations' food products; the warehouse had been destroyed by fire. 136 S. Ct. at 1014. The plaintiff corporations sued in Kansas state court and the defendant warehouse owner—Americold Realty Trust (Americold), a real estate investment trust (REIT) created under Maryland law—removed the lawsuit to federal district court, which held for Americold. *Id.* On appeal, the Tenth Circuit *sua sponte* requested briefing on the district court's diversity jurisdiction. *Id.* It eventually concluded that the plaintiff corporations were citizens of Delaware, Nebraska and Illinois and that Americold's citizenship was determined, per *Carden*, by reference to its members, including its shareholders. *Id.* at 1014–15. Without record evidence of Americold's shareholders' citizenship, the Tenth Circuit decided that the parties had failed to demonstrate that diversity of citizenship existed, *see id.* at 1015, and remanded the case to the district court to vacate its judgment and remand the matter to state court, *ConAgra Foods, Inc. v. Americold Logistics, LLC*, 776 F.3d 1175, 1182 (10th Cir. 2015). The Supreme Court affirmed, relying on *Carden* to conclude that, under Maryland law, the citizenship of a REIT included its shareholders. *Americold*, 136 S. Ct. at 1015–17. In so doing, however, the Supreme Court singled out for discussion Americold's argument that, under *Navarro*, "anything called a

---

[9] The district court reached this conclusion in light of the "plain meaning" of "artificial entity," *Wang*, 841 F. Supp. 2d at 205, *Carden*'s distinguishing of those artificial entities to which its rule did not apply and *Carden*'s "repeated discussion and differentiation of *Navarro*," *id.*

'trust' possesses the citizenship of its trustees alone, not its shareholder beneficiaries as well." *Id.* at 1016. The Court first repeated its observation that "*Navarro* had nothing to do with the citizenship of [a] 'trust.'" *Id.* (alteration in original) (some internal quotation marks omitted) (quoting *Carden*, 494 U.S. at 192–93). As the Court explained, "*Navarro* reaffirmed a separate rule that when a trustee files a lawsuit in *her* name, her jurisdictional citizenship is the State to which she belongs," a rule that "coexists" with the proposition that "when an artificial entity is sued in *its* name, it takes the citizenship of each of its members." *Id.* (emphases in original). The Court acknowledged, however, that "Americold's confusion regarding the citizenship of a trust is understandable and widely shared" and posited that such "confusion can be explained, perhaps, by tradition." *Id.* It elaborated:

> Traditionally, a trust was not considered a distinct legal entity, but a "fiduciary relationship" between multiple people. Such a relationship was not a thing that could be haled into court; legal proceedings involving a trust were brought by or against the trustees in their own name. And *when a trustee* files a lawsuit or *is sued in her own name, her citizenship is all that matters* for diversity purposes. *For a traditional trust, therefore, there is no need to determine its membership, as would be true if the trust, as an entity, were sued.*

> Many States, however, have applied the "trust" label to a variety of unincorporated entities that have little in common with this traditional template. Maryland, for example, treats a real estate investment trust as a "separate legal entity" that itself can sue or be sued. So long as such an entity is unincorporated, we apply

our "oft-repeated rule" that it possesses the citizenship of all its members. But neither this rule nor *Navarro* limits an entity's membership to its trustees just because the entity happens to call itself a trust.

*Id.* (emphases added) (citations omitted).

With respect, the meaning of the highlighted language is not easy to ascertain. As the Fourth Circuit recently declared:

Having settled the diversity of citizenship question for real estate investment trusts, perhaps the Supreme Court in *Americold* intended this statement to globally resolve the issue for other trusts. However, the statement may generate as many questions as it answers. Putting aside the lack of a comprehensive definition of a "traditional trust," the "as would be true if the trust, as an entity were sued" phrase seems open to several interpretations.

For example, does the phrase mean that there is no need to determine entity membership for diversity purposes when a "traditional trust" is sued as an entity? Or do we read the statement to mean that a trust sued as an entity must prove entity membership because it is a separate legal person from the individual trustees?

*Zoroastrian Ctr. & Darb-E-Mehr of Metro. Wash., D.C. v. Rustam Guiv Found. of N.Y.*, 822 F.3d 739, 749 (4th Cir. 2016).[10] And the parties here too disagree about *Americold*'s

---

[10] In *Zoroastrian Center*, a nonprofit entity sued a charitable trust in state court seeking to renew a lease the trust had allegedly terminated. 822 F.3d at 743–44. The trust removed the lawsuit to

meaning.[11] According to Winston, *Americold* means that diversity jurisdiction in a suit involving a traditional trust depends only on the trustees' citizenship. According to the defendants, *Americold* distinguishes not between a traditional trust and an entity only nominally a trust but instead between a suit in which a trust is the named party and one in which the trustees are the named parties.[12]

Although not all courts have to date read *Americold* to distinguish between traditional trusts and other artificial

---

federal court and the district court granted summary judgment to the trust. *Id.* On appeal, the plaintiff sought remand to Virginia state court on the ground that the trust failed to establish diversity of citizenship. *Id.* at 747. The Fourth Circuit did not resolve the *Americold* question because diversity existed regardless of whose citizenship—that of the trustees, the trust beneficiaries or both—was considered. *Id.* at 749–50.

[11] Winston participated as amicus in the *Americold* proceedings. Br. of Winston Wen-Young Wong as Amicus Curiae in Supp. of Pet'rs at 18, *Americold Realty Tr. v. ConAgra Foods, Inc.*, 577 U.S.__, 136 S. Ct. 1012 (2016) (No. 14-1382), 2015 WL 7732607, at *18 ("[D]iversity of citizenship in a suit by or against a traditional trust should be determined by the citizenship of its trustee alone . . . .").

[12] The defendants claim that Winston waived his "traditional trust" argument. There is good reason to conclude, however, that Winston did not waive the argument; in any event, we can appropriately determine this "important[] and recurring question of federal law" resulting in part from "an intervening change in the law." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992) (noting that, in such circumstances, appellate court can exercise discretion to consider issues raised for first time on appeal).

entities, some have done so. *See Juarez v. DHI Mortg. Co.*, No. CV H-15-3534, 2016 WL 3906296, at *2 (S.D. Tex. July 19, 2016) ("*Americold* provides that if the trust itself is suing or being sued, then further analysis is required to determine whether the trust is a traditional trust . . . or a business entity . . . ."); *Wells Fargo Bank, N.A. v. Transcon. Realty Investors, Inc.*, No. 3:14-CV-3565-BN, 2016 WL 3570648, at *3 (N.D. Tex. July 1, 2016) ("The citizenship of a trust may depend on whether it is a traditional trust or what some have called a business trust."), *appeal docketed*, No. 16-11167 (5th Cir. July 29, 2016); *cf. Sutter Ranch Corp. v. Cabot Oil & Gas Corp.*, No. CIV-16-42-M, 2016 WL 3945834, at *1 (W.D. Okla. July 19, 2016) ("[T]he United States Supreme Court has recently held that the citizenship of a trust, in particular a business type trust, is the citizenship of all of its members, i.e., its beneficiaries.").

We think Winston's reading of *Americold*—that is, the citizenship of a traditional trust depends only on the trustees' citizenship—is the better one.[13]   First, *Americold* is clear that

---

[13]   Moreover, Supreme Court precedent predating *Navarro*, *Carden* and *Americold* considered the citizenship of a trust beneficiary immaterial in determining diversity of citizenship. *See Bullard v. City of Cisco, Tex.*, 290 U.S. 179, 190 (1933) ("As the transfers under which the plaintiffs held the bonds and coupons were made to them as trustees, were real . . . and invested them with the full title, they were entitled, by reason of their citizenship and of the amount involved, to bring the suit in the federal court.   The beneficiaries were not necessary parties and their citizenship was immaterial."); *Bonnafee v. Williams*, 44 U.S. 574, 577 (1845) ("Where the citizenship of the parties give[s] jurisdiction, and the legal right to sue is in the plaintiff, the court will not inquire into the residence of those who may have an equitable interest in the claim. They are not necessary parties on the record.   A person having the legal right may sue, at law, in the federal courts, without reference to the citizenship of those who may have the equitable interest.").

"[m]any [s]tates . . . have applied the 'trust' label to a variety of unincorporated entities that have little in common with th[e] traditional template" for a trust. 136 S. Ct. at 1016. And *Americold* is equally clear that, "[s]o long as such an entity is unincorporated, [courts] apply [the] 'oft-repeated rule' that it possesses the citizenship of all its members." *Id.* (quoting *Carden*, 494 U.S. at 195). Because *Americold* involved an entity to which the Court applied the *Carden* test, *see id.* at 1015–16, and because, "[t]raditionally, a trust was not considered a distinct legal entity," *id.* at 1016, we believe *Americold* would not apply the *Carden* test to a traditional trust, as it is not an entity. Second, and relatedly, the Supreme Court was clear that, "[t]raditionally, a trust was . . . not a thing that could be haled into court." *Id.* We doubt that the Supreme Court envisaged a test by which a court decides that a party that traditionally cannot be brought into court, *see id.*, can nevertheless be "sued as an entity," Appellees' Br. 32 (emphasis omitted).

## New Mighty *Qua* Traditional Trust

With these principles in mind, we must decide whether New Mighty is in fact a traditional trust. We conclude that it is. New Mighty is a creature of D.C. law. *See* Joint Appendix 469. As both parties recognized at oral argument, *see* Recording of Oral Argument at 21:20–23, 38:26–36 (Sept. 21, 2016), New Mighty is governed by Title 19 of the D.C. Code, which title includes D.C.'s version of the Uniform Trust Code (UTC), *see* D.C. CODE §§ 19-1301.01 *et seq.*; *compare also* D.C. CODE § 19-1304.01(2) (trust may be created by "[d]eclaration by the owner of property that the owner holds identifiable property as trustee."), *with* Joint Appendix 461 ("Clearbridge LLC, as Trustee[,] declares a trust over one

hundred U.S. dollars ($100.00).").[14]   Although *Americold* did not provide a comprehensive definition of a "traditional trust," it did consider instructive section 2 of the Second Restatement of Trusts,[15] 136 S. Ct. at 1016, a source to which D.C. courts have also turned, *see Cabaniss v. Cabaniss*, 464 A.2d 87, 91 (D.C. 1983).[16]   According to *Americold* as well as the Restatement, a traditional trust for diversity generally describes a fiduciary relationship regarding property where the trust cannot sue and be sued as an entity under state law. More broadly, we conclude that a traditional trust is a trust that

---

[14]   The parties do not dispute that New Mighty is *not* a statutory trust within the meaning of Title 29 of the D.C. Code.  Enacted several years after New Mighty's 2005 formation, *see* 58 D.C. Reg. 1720–21, 2157–79 (Mar. 11, 2011), D.C.'s "Uniform Statutory Trust Entity Act of 2010"—contained in Title 29—requires that, "[t]o form a statutory trust, a person shall deliver a certificate of trust to the [m]ayor for filing," *see* D.C. CODE §§ 29-1201.01, 29-1202.01(a).  The record contains no such certificate.

[15]   Section 2 of the Restatement provides:

A trust, as the term is used in the Restatement of this Subject, when not qualified by the word "charitable," "resulting" or "constructive," is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it.

RESTATEMENT (SECOND) OF TRUSTS § 2 (1959).

[16]   The enactment of the UTC did not replace all of D.C.'s common law of trusts.  *See* D.C. CODE § 19-1301.06 (unless modified by D.C. law, "[t]he common law of trusts and principles of equity supplement [the UTC]").

lacks juridical person status. Whether a particular trust has or lacks juridical person status can be determined by reference to the law of the state where the trust is formed. New Mighty is not a juridical person. Under D.C. law, New Mighty is a donative trust governed by Title 19, chapter 13 of the D.C. Code and, thus, New Mighty cannot sue and be sued as an entity under D.C. law. *See, e.g.*, *Matijkiw v. Strauss*, 139 Daily Wash. L. Rptr. 1345, 1349, 1351 (D.C. Super. Ct. July 1, 2011); *In re Nat'l Student Mktg. Litig.*, 413 F. Supp. 1159, 1160 (D.D.C. 1976). It is, therefore, a traditional trust.

For their part, the defendants suggest that New Mighty's structure makes it other than traditional, pointing to the amended complaint's allegation that "Defendant New Mighty Trust is a trust structure that includes a trust formed under the laws of the District of Columbia and a trust formed under the laws of the Cayman Islands pursuant to the Special Trusts Alternative Regime." Appellees' Br. 24–25 (emphasis and internal quotation marks omitted) (quoting Am. Compl. ¶ 60). In their view, "[w]hatever is meant by a 'traditional trust,' it certainly cannot include trusts formed pursuant to a foreign statutory regime that was promulgated in 1997." *Id.* at 25. The allegation the defendants rely on, however, does not refer to New Mighty alone; the amended complaint uses the phrase "New Mighty Trust" to refer to *all* of the defendants collectively—that is, New Mighty, the New Mighty Foundation *and* Clearbridge. Whether these three defendants collectively make up a "trust structure" that includes a trust formed under Cayman Islands law is not the same question as whether New Mighty *itself* is a traditional trust. And on the latter point, the amended complaint expressly alleges that New Mighty "is a trust formed under the laws of the District of Columbia." Am. Compl. ¶ 14. We conclude, then, that New

Mighty is a traditional trust [17] and therefore assumes its trustees' citizenship for diversity jurisdiction.[18]

Having established that New Mighty is a traditional trust, we conclude complete diversity of citizenship exists. Yueh-Lan, Y.C.'s now-late widow, was a citizen of Taiwan.[19]

---

[17] The trust declaration describes New Mighty's purpose "to hold, manage and administer interests in . . . member[s] of the Formosa Plastics Group of companies[] for the benefit of [certain entities] pursuant to the Founders [sic] Vision for the betterment of mankind." Joint Appendix 461.

[18] At oral argument, New Mighty's counsel posited that the District of Columbia added "significant . . . variations" to the model Uniform Trust Code, making it difficult to differentiate a traditional trust from a statutory trust. He argued that, under D.C. Code § 19-1301.03(11), "[p]erson" is defined to include a trust and that, per D.C. Code § 19-1304.18, a trust can hold property. We think New Mighty's reliance on these provisions misplaced. Other provisions of D.C. law make clear that New Mighty is a traditional trust. *Compare, e.g.*, D.C. CODE § 19-1308.09 ("A trustee shall take reasonable steps to take control of and protect the trust property."), *and* D.C. CODE § 19-1308.11 ("A trustee shall take reasonable steps . . . to defend claims against the trust."), *with* RESTATEMENT (SECOND) OF TRUSTS § 175 ("The trustee is under a duty to the beneficiary to take reasonable steps to take and keep control of the trust property."), *and* RESTATEMENT (SECOND) OF TRUSTS § 178 ("The trustee is under a duty to the beneficiary to defend actions which may result in a loss to the trust estate, unless under all the circumstances it is reasonable not to make such defense.").

[19] All parties look to Yueh-Lan to determine citizenship on the plaintiff's side. *See, e.g.*, *Saadeh*, 107 F.3d at 57 ("[D]iversity of citizenship is determined at the time the complaint is filed."). Winston brought suit as Yueh-Lan's attorney-in-fact; when

On the other side of the litigation, the amended complaint alleges that the New Mighty Foundation is a citizen of the District of Columbia and the State of Delaware and Clearbridge, New Mighty's trustee, is a citizen of the Commonwealth of Virginia and the District of Columbia. Because New Mighty is a "traditional trust," it is its trustee Clearbridge's citizenship that is determinative. To the extent New Mighty itself is a named party to the lawsuit, it is only a nominal one, *see Navarro*, 446 U.S. at 461 ("[A] federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy.").[20]

## B. WINSTON'S MOTION TO SUBSTITUTE AND DEFENDANTS' MOTION TO DISMISS

As noted earlier, Winston and the three joint executors of Yueh-Lan's will moved to substitute the three executors in place of Yueh-Lan pursuant to Federal Rule of Appellate Procedure 43(a)(1). [21] The defendants raise a host of objections in response, primarily relating to the allegedly defective power of attorney Winston exercised in bringing suit, which, in their view, should result in dismissal. It is "our

---

Yueh-Lan later died, Winston and the three executors assumed the citizenship of the decedent. *See* 28 U.S.C. § 1332(c)(2).

[20] We do not reach Winston's alternative argument that New Mighty should be dismissed as a dispensable party pursuant to Federal Rule of Civil Procedure 21.

[21] "If a party dies after a notice of appeal has been filed or while a proceeding is pending in the court of appeals, the decedent's personal representative may be substituted as a party on motion filed with the circuit clerk by the representative or by any party." Fed. R. App. P. 43(a)(1).

usual . . . practice" to "declin[e] to address arguments unaddressed by the district court," *Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012) (per curiam), and we follow that practice here—the district court should consider the defendants' arguments in the first instance. Accordingly, we grant the substitution motion without prejudice to the defendants' ability to renew in district court those arguments they have pressed before us. *See* Appellees' Br. 41–55; Appellees' Resp. to the Mot. of Winston-Wen-Young Wong and Chen-Teh Shu, Dong-Xung Dai and Robert Shi.[22]

For the foregoing reasons, we reverse the district court's dismissal, grant the Rule 43(a)(1) substitution motion and deny without prejudice the defendants' motion to dismiss. We remand for further proceedings consistent with this opinion.

*So ordered.*

---

[22] We note Yueh-Lan's counsel's acknowledgement at oral argument that the defendants' arguments are unaffected by our grant of the Rule 43(a)(1) motion.